**SAWYER PROPERTY MANAGE-
MENT OF MARYLAND,
INC., Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL
HOUSING COMMISSION,
Respondent.**

No. 02–AA–1362.

District of Columbia Court of Appeals.

Argued Feb. 10, 2004.

Decided June 16, 2005.

Eric Von Salzen, Washington, DC, for petitioner.

Mary T. Connelly, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General, and Edward E. Schwab, Deputy Attorney General, were on the brief, for respondent.*

Vincent Mark J. Policy, Richard W. Luchs, Washington, DC and M. Ryan Jenness, filed a brief on behalf of the Apartment and Office Building Association of Metropolitan Washington as amicus curiae.

Before GLICKMAN, Associate Judge, and KERN and STEADMAN,** Senior Judges.

GLICKMAN, Associate Judge:

The Rental Housing Commission ("RHC") disallowed a rent increase for a rent-controlled apartment because of defects in the housing provider's registration and notice to the tenant and, more critically, because the increase did not implement a properly perfected upward adjustment of the rent ceiling for the apartment. We affirm on the latter ground. We defer to the RHC's interpretation of statutory provisions and its own regulations governing two common rent ceiling adjustments that a housing provider may take, the adjustment of general applicability and the vacant accommodation adjustment. The RHC reasonably construed its regulations to require a housing provider to file for either rent ceiling adjustment within thirty days after it first becomes eligible for it. A housing provider that fails to meet this thirty-day deadline, the RHC held, forfeits its right to the adjustment.

## I.

In June of 1999, Brenda Mitchell signed a one-year lease for apartment number 419 in Walden Commons, a multi-unit housing

---

* Respondent's counsel, who were members of the Office of the Corporation Counsel when this case was argued, are identified by their current titles in the renamed Office of the Attorney General for the District of Columbia. *See* Mayoral Order No. 2004–92, 51 D.C. Reg. 6052 (May 26, 2004).

** Judge Steadman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on October 18, 2004.

accommodation located at 1336 Missouri Avenue, N.W., in the District of Columbia. Ms. Mitchell, who is disabled and lives on a fixed disability income, agreed to a rental rate of $625 per month. The lease did not specify the rent ceiling applicable to apartment 419 under the District's rent control laws, and Ms. Mitchell evidently was not informed of the rent ceiling when she signed the lease.

The owner of Walden Commons, Ms. Mitchell's landlord, was identified in the lease as Lynwood L.L.C. At the time Ms. Mitchell signed the lease, the apartment building was managed by the landlord's agent, Winn Management, Inc. In early 2000, the landlord replaced Winn Management with petitioner Sawyer Property Management of Maryland, Inc. ("Sawyer").

On May 30, 2000, Ms. Mitchell received a "Tenant Notice of Increase of General Applicability" informing her that her monthly rent would be increased by twenty percent, from $625 to $750. The notice did not disclose the basis for a rent increase of this magnitude. It stated only that Ms. Mitchell's rent ceiling would be increased by 2.1%, from $1,267 to $1,294 per month, to reflect the increase in the consumer price index for the Washington, D.C. area during calendar year 1999.

Ms. Mitchell contacted the office of the Rent Administrator to investigate the propriety of the rent increase. She was informed that the most recent filing on record from her housing provider was a 1998 "Certificate of Election of General Applicability." According to this filing, the rent ceiling for apartment number 419 was $782 and the actual rent was $553 per month. There were no documents in the Rent Administrator's file justifying a current rent of $625, an increase to $750, or either of the rent ceilings mentioned in the tenant notice Ms. Mitchell received. Further, there was no amended registration form

on file identifying Sawyer as the current manager of the property.

After receiving this information, Ms. Mitchell filed a tenant petition complaining, *inter alia,* that her housing accommodation was not properly registered and that her rent increase was excessive, in violation of the Rental Housing Act of 1985. "I am on a fixed income," Ms. Mitchell stated, "and unable to meet this increase of $125." In response, Sawyer asserted that the accommodation was registered properly and that it was entitled to raise Ms. Mitchell's rent to implement one of several authorized increases in the rent ceiling for her apartment. These rent ceiling increases were of two types: so-called adjustments of general applicability that were based on yearly increases in the consumer price index, and adjustments that were permitted when Ms. Mitchell's apartment was vacant (prior to her occupancy).

The dispute proceeded to a full evidentiary hearing. In August 2001, the hearing examiner issued his decision. Ruling in Ms. Mitchell's favor on her principal claims, the examiner disallowed the rent increase in its entirety and ordered Sawyer to refund $1,828.75, representing the amount Ms. Mitchell was overcharged with interest. The examiner also fined Sawyer $500 for knowingly demanding and receiving rent in excess of the maximum allowed by law. *See* D.C.Code § 42–3509.01(a) (2001).

On appeal, with one Commissioner dissenting, the RHC affirmed the hearing examiner's order. On Sawyer's motion for reconsideration, the RHC modified its reasoning but not the result. The RHC ultimately identified three independently sufficient reasons why the rent increase was invalid. First, the housing provider had not filed a timely amended registration form to report the change in management

at Walden Commons.[1]  Second, the rent increase notice given to Ms. Mitchell was defective because it did not identify the previously authorized rent ceiling adjustment that the provider sought to implement.[2]  Third, the provider had lost its opportunity to take advantage of the rent ceiling adjustments on which it relied because it failed to "perfect" them within thirty days after it became eligible to do so.  Of the three reasons given for disallowing the rent increase, this last is the most definitive, for while the formal defects in the registration and notice are readily correctable, the loss of the right to implement rent ceiling adjustments is not.  Under the RHC's interpretation of its regulations, the loss is permanent.

## II.

Joined by the Apartment and Office Building Association of Metropolitan Washington as *amicus curiae*, Sawyer attacks the RHC's decision on numerous grounds.  While Sawyer may not prevail unless it successfully challenges each of the three rationales on which the RHC relied, we must affirm as long as any one

of the rationales withstands our scrutiny, which proves to be the case.  We do not reach the merits of the RHC's first two reasons for disallowing the rent increase, for Sawyer does not persuade us that the RHC erred in concluding that the housing provider lost its claimed rent ceiling adjustments by failing to perfect them in time.

## A.

■  As the dispositive issues before us concern the RHC's interpretation of the rent control statutes and regulations, our review is circumscribed.  While this court is the final arbiter of legal questions, we owe considerable deference to the RHC's interpretation of the statutes it administers and the regulations it promulgates.  *Winchester Van Buren Tenants Ass'n v. D.C. Rental Hous. Comm'n*, 550 A.2d 51, 55 (D.C.1988); *Charles E. Smith Mgmt., Inc. v. D.C. Rental Hous. Comm'n*, 492 A.2d 875, 877 (D.C.1985).  We are obliged to sustain the RHC's interpretation of those statutes and regulations unless it is unreasonable or embodies "a material mis-

---

1.  *See* D.C.Code. §§ 42–3502.08(a)(1) and 42–3502.05(g) (2001).  D.C.Code § 42–3502.08(a)(1)(B) provides in pertinent part that "the rent for any rental unit shall not be increased above the base rent unless . . . . [t]he housing accommodation is registered in accordance with § 42–3502.05." Subsection (a)(1)(D) adds specifically that "[t]he manager of the accommodation, when other than the housing provider, [must be] properly registered under the housing regulations if the regulations require registration."  Section 42–3502.05(g) provides that "[a]n amended registration statement shall be filed . . . within 30 days of any event which changes . . . management of any rental unit in a registered housing accommodation."

2.  Two years earlier, the RHC had stated that its regulations "do not require the housing provider to identify the unimplemented rent ceiling adjustment that is being implemented

in the new rent charged." *Lincoln Prop. Mgmt. v. Chibambo*, TP 24,861 (RHC Nov. 29, 2000) at 15.  That statement was erroneous, the RHC now concluded, in light of a specific requirement in its regulations that rent increase notices identify "[t]he date and authorization for the rent ceiling adjustment taken and perfected pursuant to [D.C. Mun. Regs. tit. 14,] § 4202.9." D.C. Mun. Regs. tit. 14, § 4205.4(a)(4) (1998).  (As the RHC acknowledged, the reference to § 4202.9 was a typographical error; no such section exists in Title 14.  In 2003, the District of Columbia Office of Documents corrected the error to cite to § 4204.9 in the electronic version of the District of Columbia Municipal Regulations published on the Internet pursuant to D.C.Code § 2–555(a)(4) (2004 Supp.).  To date, however, the correction has not been published in the D.C. Register as is required.  *See* D.C.Code § 2–558(b) (2001).)

conception of the law," even if a different interpretation also may be supportable. *Jerome Mgmt., Inc. v. D.C. Rental Hous. Comm'n,* 682 A.2d 178, 182 (D.C.1996). Thus, "[t]o persuade us to reject the Commission's construction ..., the [challenging party] must show that it is plainly wrong or incompatible with the statutory purpose." *Winchester Van Buren,* 550 A.2d at 55.

## B.

A large proportion of rental housing in the District of Columbia is subject to the comprehensive regulatory scheme commonly known as rent control. *See* D.C.Code § 42–3501.01 *et seq.;* D.C. MUN. REGS. tit. 14, § 3800.1 *et seq.* (2004). Briefly put, the goal of this scheme, born of a perceived severe housing shortage in the District, is to "ensure that decent, affordable housing is available for the various sectors of the population, while at the same time landlords are allowed a fair rate of return on their investments." *Charles E. Smith Mgmt.,* 492 A.2d at 878. In the pursuit of that goal, housing providers are subject to a variety of reporting and monitoring requirements. "[S]trict compliance" with those requirements has been found to be essential to the efficient and effective enforcement of the rent control program. *Id.*

Under the rent control laws, "the principal protections for tenants are the imposition of a rent ceiling and the prohibition against upward adjustment of that ceiling except on specifically enumerated grounds." *Winchester Van Buren,* 550 A.2d at 55. The rent ceiling operates as an upper bound on the amount of rent that a housing provider is allowed to charge a tenant. *Id.* at 53; *see also Afshar v. D.C. Rental Hous. Comm'n,* 504 A.2d 1105, 1107 (D.C.1986); D.C.Code §§ 42–3502.06,

42–3502.08(h)(1); D.C. MUN. REGS. tit. 14, § 4205.7.

A rent ceiling is established for each rental unit by starting with a "base rent," *see* D.C.Code § 42–3501.03(4), and adding any "duly authorized" upward adjustments that are permitted from time to time. *Winchester Van Buren,* 550 A.2d at 53. Downward adjustments of the rent ceiling also may be required, for example to reflect substantial decreases in the services or facilities supplied to the rental unit by the housing provider. D.C.Code § 42–3502.11. In order to obtain one of the several upward rent ceiling adjustments authorized by law, a housing provider must "take" and "perfect" the adjustment in accordance with the requirements of the housing regulations. D.C. MUN. REGS. tit. 14, § 4200.5. To do that, as discussed in further detail below, the provider must either petition for, or report its election to take, the rent ceiling adjustment in a timely and appropriate manner, and it must provide appropriate notification to tenants who may be affected by the adjustment. D.C. MUN. REGS. tit. 14, §§ 4204.9, 4204.10. The provider must perfect its entitlement to a rent ceiling adjustment in accordance with regulatory requirements in order to "implement" the adjustment in a rent increase. *See* D.C. MUN. REGS. tit. 14, § 4205.7. A rent increase may implement only one rent ceiling adjustment at a time; in other words, the amount of any single rent increase is limited to the amount of a single available adjustment. *See* D.C.Code § 42–3502.08(h)(1). Thus, where the rent ceiling exceeds the rent charged by the sum of multiple unimplemented adjustments, a provider will not be able to raise the rent all the way to the rent ceiling in one fell swoop.

The reporting of rent ceiling adjustments through timely filings facilitates the administration of rent control. It does

so by enabling the Rent Administrator and affected tenants to ascertain the true applicable rent ceiling for any rental unit, determine whether any change in that rent ceiling is permitted and properly computed, and confirm that any rent increase is based on a rent ceiling adjustment that is authorized and available for implementation.

Among the limited number of upward rent ceiling adjustments that a housing provider may take are the two on which Sawyer relied to justify Ms. Mitchell's rent increase in whole or in part: the adjustment of general applicability and the vacant accommodation adjustment. We shall address the RHC's decision with respect to each adjustment in turn.

## C.

■■■■■ The adjustment of general applicability allows housing providers the option to increase rent ceilings annually in order to keep up with inflation.[3] The adjustment "shall be equal to the change during the previous calendar year, ending each December 31, in the Washington, D.C., Standard Metropolitan Statistical Area Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI–W) for all items during the preceding calendar year," subject to a cap of ten percent. D.C.Code § 42–3502.06(b). It is the RHC's duty to determine the amount of the general applicability adjustment annually and publish it by March 1 of each year. *See id.* and D.C.Code § 42–3502.02(a)(3). The adjustment is published annually in the D.C. Register with an effective date of May 1.[4]

In order to "take and perfect" a rent ceiling adjustment of general applicability, a housing provider must file with the Rent Administrator and serve on affected tenants a "Certificate of Election of Adjustment of General Applicability." D.C. Mun. Regs. tit. 14, § 4204.10. This certificate of election must be filed and served "within thirty (30) days following the date when the housing provider is first eligible to take the adjustment." *Id.* § 4204.10(c). In 1990, the RHC held that a housing provider was "first eligible" to take the adjustment on the date the adjustment became effective, *i.e.,* on May 1 in each of the two years in question.[5] *Ayers v. Landow,* TP 21,273 (RHC Oct. 4, 1990) at 20. Because the provider had filed his certificates of election more than thirty days after May 1 each year, the RHC declared that he could not increase his rent ceiling based on the general applicability adjustments for those years. *Id.*

---

3. In lieu of the general applicability adjustment, the housing provider may elect to petition for a hardship adjustment of the rent ceiling in order to generate up to a twelve percent rate of return on equity. *See* D.C.Code §§ 42–3502.06(c), 42–3502.12.

4. *See, e.g.,* 50 D.C. Reg. 1809 (Feb. 21, 2003); 49 D.C. Reg. 1156 (Feb. 8, 2002); 48 D.C. Reg. 1856 (Feb. 23, 2001); 47 D.C. Reg. 1303 (Feb. 25, 2000); 46 D.C. Reg. 2263 (Feb. 26, 1999); 45 D.C. Reg. 1142 (Feb. 27, 1998); 45 D.C. Reg. 1861 (Mar. 27, 1998) (amending notice); 44 D.C. Reg. 1215 (Feb. 28, 1997); 43 D.C. Reg. 1172 (Mar. 1, 1996).

5. There may be circumstances (not arising either in *Ayers* or the present case) under which a housing provider will not be eligible to take an adjustment of general applicability until some time after the published effective date of the adjustment. For example, a housing provider may take and perfect a rent ceiling adjustment of general applicability only once in any twelve month period. D.C. Mun. Regs. tit. 14, § 4206.3; *see also* D.C.Code 42–3502.06(b). If the first adjustment is perfected on May 31, for instance, the twelve-month rule renders the provider ineligible to take the second adjustment until May 31 of the following year, thirty days later than the published effective date of that adjustment.

In the case at bar, Sawyer claimed the benefit of the rent ceiling adjustments of general applicability that the RHC published in 1997, 1998, 1999, and 2000. However, none of the housing provider's certificates of election was filed with the Rent Administrator within thirty days of the May 1 effective dates of those adjustments. The certificates were either filed later or, in one case, not at all. The housing provider waited approximately eleven months, eleven months, and two months before filing certificates for the adjustments that took effect on May 1 in 1997, 1998, and 1999, respectively.[6] It further appears that as of the date of the hearing in this case, the provider still had not filed a certificate for the adjustment that took effect on May 1 of 2000, even though the provider cited that particular adjustment in Ms. Mitchell's rent increase notice.[7] Accordingly, following its decision in *Ayers v. Landow,* the RHC concluded that the housing provider had perfected none of the adjustments of general applicability on which Sawyer relied. Therefore, the RHC held, none of those attempted—but in fact ineffective—rent ceiling adjustments could support a rent increase of any amount.[8]

■ In this court, Sawyer contends that by applying D.C. Mun. Regs. tit. 14, § 4204.10 to disallow its claimed rent ceiling adjustments of general applicability, the RHC misconstrued and violated the rent control statutes. First, Sawyer argues, the requirement of § 4204.10 that a certificate of election be filed in order to perfect an adjustment of general applicability is in conflict with the last sentence of D.C.Code § 42–3502.05(g), which states that "[n]o amended registration statement shall be required for a change in rent under § 42–3502.06(b) [the provision concerning adjustments of general applicability]." Asserting that a certificate of election is merely an amended registration statement by another name, Sawyer argues that it had no legal obligation to file a certificate of election at all, let alone an obligation to file it by a certain time.

■ The RHC did not address this argument because Sawyer never presented it. Sawyer is therefore faced with the general rule that "contentions not urged at the administrative level may not form the basis for overturning the decision on review." *Goodman v. D.C. Rental Hous. Comm'n,* 573 A.2d 1293, 1301 (D.C.1990). This rule ensures that we do not usurp the agency's role, prevents us from making decisions on a deficient record and without the benefit of the agency's special expertise, and avoids unfair surprise to opposing parties. We have discretion to deviate from our policy of "refus[ing] to consider contentions not presented before the administrative agency at the appropriate time" "only in exceptional circumstances to avoid manifest injustice." *Id.* at 1301 & 1301 n. 21; *see also Hormel v. Helvering,*

6. Nor did the provider effect timely service of its certificates on the affected tenants in those years. The RHC noted, for example, that the provider did not serve the tenant with its certificate of election for the May 1, 1999 adjustment until five months past the date of filing.

7. There is no dispute that the provider was eligible to take the annual adjustment of general applicability as of the published effective date of May 1 in each of the four years in question. Since the provider failed to perfect any of the adjustments, the twelve-month waiting period discussed in note 5, *supra,* never came into play so as to postpone the first date on which the provider would be eligible to take any succeeding adjustment.

8. It should be noted that none of the rent ceiling adjustments of general applicability cited by Sawyer was large enough to justify Ms. Mitchell's $125 rent increase *in toto.*

312 U.S. 552, 558, 61 S.Ct. 719, 85 L.Ed. 1037 (1941) (appellate courts need not "confine themselves to the issues raised below ... where the obvious result would be a plain miscarriage of justice"); *R.R. Yardmasters of Am. v. Harris,* 232 U.S.App.D.C. 171, 177–78, 721 F.2d 1332, 1338 (1983) (waiving exhaustion of administrative remedies requirement where question is "solely one of statutory interpretation" and its resolution did "not require development of a factual record, the application of agency expertise or the exercise of administrative discretion").

No such exceptional circumstances are present here. As an initial matter, we are hard-pressed to perceive the conflict between regulation and statute that Sawyer posits. There is a fundamental difference, manifest throughout the rent control regulations, between increasing the rent ceiling and increasing the rent. The regulation that Sawyer attacks addresses the former, and the statute, the latter. The regulation imposes filing requirements for the perfection of rent ceiling adjustments of general applicability, not for rent increases based on those adjustments. *See* D.C. Mun. Regs. tit. 14, § 4103.1(d), (e). The statute, on the other hand, does no more than exempt rent increases implementing general applicability adjustments from the general rule that a rent increase ordinarily does require the filing of an amended registration statement. *See* D.C.Code § 42–3502.05(g).

■ Sawyer observes that nothing in the rent control statute affirmatively requires a housing provider to perfect a rent ceiling adjustment of general applicability. The implication of this observation

is that the RHC was not authorized to promulgate such a requirement in 14 D.C. Mun. Regs. tit. 14, § 4204.10. On its face, this argument is not a promising one, for the RHC has the express power to promulgate rules and procedures that will effectuate the administration of rental housing laws. D.C.Code § 42–3502.02(a)(1). We are far from persuaded that the RHC has exercised this power unreasonably, or that the regulation in question is *ultra vires,* given the evident importance of the reporting requirements to the enforcement of rent control laws. That said, the argument that D.C. Mun. Regs. tit. 14, § 4204.10 is *ultra vires* is another argument that Sawyer failed to make before the RHC and that we therefore decline to consider further.

■ Sawyer's other argument, which was made before the RHC and is therefore properly before us, is that the thirty-day deadline for perfecting rent ceiling adjustments of general applicability, as set forth in D.C. Mun. Regs. tit. 14, § 4204.10 and construed in *Ayers v. Landow,* was superseded by Section 2 of the Unitary Rent Ceiling Adjustment Amendment Act of 1992, D.C. Law 9–191 (1993). The RHC rejected this argument as erroneous, and we agree. In Section 2, the Unitary Act amended the Rental Housing Act of 1985 to add subsection (h) to D.C.Code § 42–3502.08. *See* D.C. Act 9–312 (Law 9–191), 39 D.C. Reg. 9005 (Dec. 4, 1992). The Council's purpose in adding subsection (h) was to stop housing providers from implementing more than one rent ceiling increase at the same time in a single rent increase, a practice referred to as "stacking." [9] In so doing, the Council sought to

---

**9.** Council of the District of Columbia, Comm. on Consumer and Regulatory Affairs, Report on Bill 9–305, "Unitary Rent Ceiling Adjustment Amendment Act of 1992," at 2 (1992) (hereinafter, "Committee Report"). The Committee

considered the new subsection (h) necessary to effectuate the intent of the existing requirement that "[n]o adjustments in rent ... may be implemented until a full 180 days have elapsed since any prior adjustment." *Id.;*

reassure anxious providers that they would not lose their rent ceiling increases by not implementing them immediately.[10] To accomplish these twin aims, subsection (h) reads as follows:

> (h)(1) One year from March 16, 1993, unless otherwise ordered by the Rent Administrator, each adjustment in rent charged permitted by this section[11] may implement not more than 1 authorized and previously unimplemented rent ceiling adjustment. If the difference between the rent ceiling and the rent charged for the rental unit consists of all or a portion of 1 previously unimplemented rent ceiling adjustment, the housing provider may elect to implement all or a portion of the difference.
>
> (2) Nothing in this subsection shall be construed to prevent a housing provider, at his or her election, from delaying the implementation of any rent ceiling adjustment, or from implementing less than the full amount of any rent ceiling adjustment. A rent ceiling adjustment, or portion thereof, which remains unimplemented shall not expire and shall not be deemed forfeited or otherwise diminished.

D.C.Code § 42–3502.08(h).

The fact that subsection (h)(2) allows a housing provider to delay *implementing* any rent ceiling adjustment in a rent increase without forfeiting the adjustment does not mean, as Sawyer contends, that the provider is free to delay *perfecting* its entitlement to the adjustment as well. The Unitary Act did not address the requirements for perfection, as opposed to implementation, of rent ceiling adjustments. The Act thus did not supersede or in any way affect the thirty-day perfection requirement of D.C. Mun. Regs. tit. 14, § 4204.10.

Sawyer nonetheless argues that the RHC stated in 1998 that subsection (h)(2) overruled the thirty-day perfection requirement, and that the Council implicitly approved that statement, even if it was incorrect, by reenacting the Rental Housing Act without change in 2000.[12] *See Carter v. Davis*, TP 23,535 & 23,553 (RHC June 30, 1998), at 9 (stating that subsection (h)(2) "clearly overturns the Commission's holding, relied on by the tenants, in *Ayers v. Landow*"); *Marshall v. D.C. Rental Hous. Comm'n*, 533 A.2d 1271, 1275 (D.C.1987) (" '[R]eenactment of a statute without change in its language indicates approval of interpretations rendered prior to the reenactment. . . .' ") (quoting 2A SUTHERLAND ON STATUTORY CONSTRUC-

---

D.C.Code § 42–3502.08(g). "Tenants and tenant advocates have argued that such 'stacking' practices are a clear circumvention of the intent of the law, which was to keep rents affordable and to keep tenants from being overwhelmed by dramatic increases." COMMITTEE REPORT at 2.

10. The COMMITTEE REPORT explains that the public hearing on the bill

> demonstrated great confusion over whether the bill would cause unimplemented rent ceiling adjustments to somehow expire if not used within a certain period of time.
> To prevent any confusion on this matter, the Committee has added a new subsection to make clear that a housing provider does

not lose an authorized rent ceiling increase merely by delaying partial or full implementation. Once approved, a rent ceiling adjustment does not become invalid or expire because of postponed implementation.
*Id.* at 4.

11. D.C.Code § 42–3502.08 ("Increases above base rent") specifies the conditions that a housing provider must meet in order to raise the rent for any rental unit above the base rent.

12. *See* D.C.Code § 42–3509.07; D.C. Law 13–172, § 1202(b), 47 D.C. Reg. 6308, 6343 (2000) (extending the expiration date of the Rental Housing Act from December 31, 2000 to December 31, 2005).

TION, § 45.12, at 55 (Sands ed., 4th ed. 1985)).

This argument does not withstand scrutiny. The statement in *Carter* on which Sawyer relies did not say, nor did it mean, what Sawyer claims, that subsection (h)(2) overturned the thirty-day deadline for *perfecting* a rent ceiling adjustment of general applicability. The issue in *Carter* that the RHC addressed was whether there was a deadline for *implementing* the rent ceiling adjustment in a rent increase, not for *perfecting* the adjustment. As the opinion states, the tenants argued that "the hearing examiner erred when he permitted the housing providers to *implement* adjustments of general applicability in 1992 and 1993 beyond the thirty (30) day period within which housing providers were eligible to make an adjustment in rent ceilings." *Carter*, TP 23,535 & 23,553 at 9. Thus, the only "question" to which the RHC spoke was "whether the hearing examiner improperly approved the 1992 and 1993 rent increases of general applicability beyond the thirty (30) day limit," *id.*, not whether the examiner improperly approved rent ceiling adjustments taken after the deadline. In answering the question before it, the RHC recognized that, under subsection (h)(2), there is no deadline for implementing a rent ceiling adjustment in a rent increase. Although the RHC mistakenly thought that this conclusion was contrary to its holding in *Ayers v. Landow*, its mistake was of no consequence, for it said nothing in *Carter* to overrule its actual holding in *Ayers*. In point of fact, as the RHC stated when it rejected Sawyer's argument in the present case, *Carter* did not overrule anything in *Ayers*.

■■■■■ Furthermore, the Council's decision in 2000 simply to extend the expiration date of the entire Rental Housing Act placed no legislative imprimatur on *Car-*

*ter's* purported interpretation of a particular provision of that Act. "At best the reenactment of statutes is a nebulous foundation for statutory construction, and before a mere reenactment can be given conclusive effect as a [legislative] adoption of an administrative interpretation, it must be shown that [the legislature] was conscious that it was doing so." *Pac. Power & Light Co. v. Fed. Power Comm'n*, 87 U.S.App. D.C. 261, 264, 184 F.2d 272, 275 (1950). In the absence of such a showing, a presumption that reenactment implies approval may make sense in special circumstances, as "where administrative rulings and interpretations are under constant observation of the legislature." 2B SUTHERLAND ON STATUTORY CONSTRUCTION § 49:09, at 109–110 (Singer ed., 6th ed. 2000),[hereinafter, SUTHERLAND]; *see also Marshall*, 533 A.2d at 1276 n. 2 (inferring from circumstantial indicators that "those responsible for reenacting the statutory language were well aware of the language they were reaffirming"). However, the presumption "does not apply where nothing indicates that the legislature had its attention directed to the administrative interpretation upon reenactment." SUTHERLAND at 110; *accord, Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock*, 266 U.S.App.D.C. 335, 338–39, 835 F.2d 912, 915–16 (1987). "Where the law is plain, subsequent reenactment [by itself] does not constitute an adoption of a previous administrative construction" that is erroneous. *Demarest v. Manspeaker*, 498 U.S. 184, 190, 111 S.Ct. 599, 112 L.Ed.2d 608 (1991).

These principles require us to reject Sawyer's contention that the Council embraced *Carter's* misstatement merely by extending the Rental Housing Act's expiration date in 2000. There is not the slightest indication that the Council considered, or was even aware of, the supposed

construction that the RHC may have placed on subsection (h)(2) of D.C.Code § 42–3502.08 in *Carter.* Moreover, regardless of any agency construction, subsection (h)(2) plainly does not preclude deadlines for the perfection of rent ceiling adjustments.

In sum, Sawyer does not persuade us that the RHC misinterpreted the law governing rent ceiling adjustments of general applicability. We next consider the vacancy adjustment.

### D.

■ The vacancy adjustment permits a housing provider to increase the rent ceiling for a rental unit if the tenant vacates the unit on her own initiative or as a result of a notice to vacate for nonpayment of rent, violation of an obligation of her tenancy, or use of the unit for an illegal purpose. D.C.Code § 42–3502.13(a). Upon the occurrence of one of those triggering events, the provider may elect either to raise the rent ceiling for the unit by 12% or to increase the ceiling to equal that of a substantially identical unit in the same housing accommodation. *Id.*; *see Marshall,* 533 A.2d at 1274–77. "A housing provider who so elects shall take and perfect a vacancy rent ceiling adjustment in the manner set forth in [D.C. Mun. Regs. tit. 14,] § 4204.10 [addressing perfection of rent ceiling adjustments of general applicability] ...." D.C. Mun. Regs.

tit. 14, § 4207.5. As we have seen, § 4204.10 requires the housing provider to perfect a general applicability adjustment within thirty days after it is "first eligible" to do so. Therefore, as both the hearing examiner and the RHC in this case concluded, a housing provider must perfect a vacancy adjustment within thirty days of the rental unit becoming vacant.[13]

The RHC's determination that a provider ordinarily is "first eligible" to take a vacancy adjustment when the vacancy occurs is certainly reasonable, and Sawyer does not contest it. Moreover, for purposes of perfection, it appears reasonable for the RHC to treat vacancy adjustments like adjustments of general applicability because the two adjustments share an important characteristic that distinguishes them from other statutorily authorized rent ceiling adjustments: a housing provider is allowed to implement either of them in a rent increase without first obtaining the Rent Administrator's prior approval of the adjustment. *See* D.C.Code §§ 42–3502.06(b) (general applicability); 42–3502.13 (vacancy); D.C. Mun. Regs. tit. 14, § 4204.2. Unless a vacancy adjustment must be perfected within thirty days as set forth in § 4204.10, therefore, a housing provider could delay taking it indefinitely, in which case the Rent Administrator would have no record of the adjustment until the provider ultimately relies on it to justify a rent increase.[14] As a result, the

---

13. As in the case of general applicability adjustments, *see* note 5, *supra,* there may be circumstances (not present here) in which a later eligibility date would govern the perfection of a vacancy adjustment. Such circumstances could arise, for example, by the operation of D.C. Mun. Regs. tit. 14, § 4207.3, which states that a housing provider is not eligible to take and perfect a vacancy adjustment for twelve months after perfecting a hardship adjustment for the same unit under D.C.Code § 42–3502.12.

14. Other upward adjustments of the rent ceiling require the Rent Administrator's prior approval, which the housing provider must obtain by petition. *See* D.C.Code §§ 42–3502.10 (adjustments to allow for capital improvements); 42–3502.11 (for changes in related services or facilities); 42–3502.12 (for hardship); 42–3502.14 (for substantial rehabilitation); D.C. Mun. Regs. tit. 14, § 4204.3. The petition process ensures that the adjustment is recorded in a timely fashion, before it may become the basis of a rent increase. Where the Rent Administrator's prior approval is re-

tenant who rents the (formerly) vacant unit could be misled about the rent ceiling that applies to the unit, and she could be unfairly and unpleasantly surprised when both the rent·ceiling and the rent are later raised. Additionally, the passage of time and intervening events could make it more difficult for both the tenant and the Rent Administrator to confirm the correctness of. the upward adjustment taken for the vacancy and the rent ceiling that should be in effect. Multiple complications might ensue, for numerous vacancies can occur at random times in a large, multi-unit housing accommodation, leaving all parties unsure about the significance of the rent ceilings on file with the Rent Administrator at any given moment.

Sawyer contended that Ms. Mitchell's $125 rent increase implemented either of two vacancy rent ceiling adjustments (each of which was greater than $125) to which the housing provider was entitled. In each instance, however, the provider failed to file for the adjustment within thirty days after apartment number 419 became vacant. The first vacancy occurred on December 12, 1998, but the provider did not file to take an adjustment until April 6, 1999, approximately five months later. The second vacancy occurred on May 1, 1999, but the provider did not file for the adjustment until July 2, 1999, almost two months later. The RHC ruled that since neither adjustment was perfected properly, neither could support a subsequent rent increase.

■ Challenging that ruling, Sawyer reiterates its argument that .the thirty-day

quired, therefore, it is unnecessary to require perfection in accordance with the requirements of § 4204.10 to ensure that the rent ceiling adjustment is on file; compliance with D.C. Mun. Regs. tit. 14, § 4204.9, a section discussed *infra,* is sufficient.

deadline in D.C. Mun. Regs. tit. 14, § 4204.10 violates D.C.Code § 42–3502.08(h). Our reasons for rejecting that argument in connection with the general applicability adjustment are equally applicable here, and we shall not repeat them.

■ Sawyer also contends that the RHC misconstrues D.C. Mun. Regs. tit. 14, § 4207.5 when it reads that section literally to require vacancy adjustments to be perfected in the manner set forth in § 4204.10 for general applicability adjustments. The literal reading is erroneous, Sawyer argues, because it conflicts with the filing requirements of other provisions of law and rests on what it claims is a typographical error in § 4207.5. Sawyer has waived all these claims, however, because it did not present them to the RHC. *See Goodman,* 573 A.2d at 1301. Once again, extenuating circumstances that might lead us to overlook that waiver are absent. Additionally, Sawyer's claims are debatable at best and, in the final analysis, are beyond this court's capacity to resolve on the existing record.

To begin with, the RHC's reading of § 4207.5 is not inconsistent with the filing requirements in the other provisions of law that Sawyer cites, D.C.Code § 42–3502.05(g) and D.C. Mun. Regs. tit. 14, § 4103.1. Those provisions do not speak to what is necessary to perfect a vacancy rent ceiling adjustment; rather, they establish the separate filing requirements that exist when a housing provider implements a rent increase based on such an adjustment.[15] As we have seen, under the regu-

15. Thus, D.C.Code § 42–3502.05(g) states that "[a]n amended registration statement shall be filed by each housing provider whose rental units are subject to registration under this chapter within 30 days of any event which changes or substantially affects the rents, including vacant unit rent increases under § 42–3502.13 ...."; and D.C. Mun.

latory framework that has been erected to administer rent control, perfection and implementation of a rent ceiling adjustment are conceptually different stages, to which different reporting requirements may apply. There is no conflict, therefore, between applying D.C. Mun. Regs. tit. 14, § 4204.10 to the perfection of vacancy rent ceiling adjustments and applying the amended registration provisions to the implementation of vacancy-based rent increases.

Sawyer argues that § 4204.10 addresses adjustments of general applicability only, while the perfection of all other rent ceiling adjustments—including the vacancy adjustment—is governed by a different provision, D.C. Mun. Regs. tit. 14, § 4204.9.[16] The problem with this textual argument is that it reads §§ 4204.9 and 4204.10 in a vacuum and ignores § 4207.5, which states explicitly that vacancy adjustments are to be perfected in accordance with § 4204.10.

Sawyer and the amicus insist, however, that the reference to § 4204.10 rather than § 4204.9 in D.C. Mun. Regs. tit. 14, § 4207.5 is a typographical error-an error that has gone undetected from 1986 (when the RHC first issued the regulation in its final form in the District of Columbia Register) until the present petition for review.[17] See 33 D.C. Reg. 1336, 1391 (Mar. 7, 1986) (Notice of Final Rulemaking). It is particularly unfortunate that Sawyer did not raise this claim before the RHC, and not merely because that body is in the best position of all to determine whether there is a misprint in a regulation that it promulgated. Whether § 4207.5 contains a typo is a question of fact that this court is not equipped to resolve. The record as it stands simply does not permit us to decide the question.[18] The sole evidentiary basis of the claim is the fact that when the current housing regulations first were proposed and released for comments, the nascent § 4207.5 provided that vacancy rent ceiling adjustments were to be taken and perfected in the manner set forth in

Regs. tit. 14, § 4103.1 states that "[e]ach housing provider of a rental unit or units covered by the [Rental Housing] Act shall file an amendment to the Registration/Claim of Exemption form provided by the Rent Administrator ... (e) [w]ithin thirty (30) days after the implementation of any vacant accommodation rent increase pursuant to § 213 of the Act [D.C.Code § 42–3502.13]."

16. D.C. Mun. Regs. tit. 14, § 4204.9 states that "[e]xcept as provided in § 4204.10, any rent ceiling adjustment authorized by the Act and this chapter shall be taken and perfected within the time provided in this chapter, and shall be considered taken and perfected only if the housing provider has filed with the Rent Administrator a properly executed amended Registration/Claim of Exemption Form as required by § 4103.1, and met the notice requirements of § 4101.6." Since § 4204.9 thus incorporates the requirements of § 4103.1(e), which is quoted in note 15, *supra,* Sawyer concludes that a housing provider does not have to file anything to perfect a vacancy

adjustment until thirty days after it has implemented that adjustment in a rent increase.

17. It should be noted that there was nothing hidden or obscure about the requirement, said now to stem from a mere typo, that vacancy rent ceiling adjustments be perfected within thirty days of the vacancy. The housing provider in this case was aware of it in 1999, when it filed amended registration forms to take its vacancy adjustments. In one of its filings, which are included in the record, the provider acknowledged that its submission was untimely.

18. The Administrator of the District of Columbia Office of Documents is charged by law with the duty to correct typographical errors in regulations and other documents printed in the District of Columbia Register and the District of Columbia Municipal Regulations by publishing an errata list or republishing the misprinted document in corrected form. D.C.Code § 2–559. No such correction has been made.

§ 4204.9. *See* 33 D.C. Reg. 446, 503 (January 24, 1986) (Notice of Proposed Rulemaking). The reference changed from § 4204.9 to § 4204.10 two months later, in the Notice of Final Rulemaking, without explanation, even though the final Notice stated that no changes had been made to the text of the regulations as proposed.[19] 33 D.C. Reg. 1336. This evidence is enough, we grant, to raise the question whether the final version of § 4207.5 contains a misprint, unlikely as it is that such a consequential error could have gone unnoticed by the RHC for so long. This evidence is not enough, however, to prove conclusively that the reference to § 4204.10 is a typo. If there was a typographical error, it could have been in § 4207.5 as it was initially proposed. Notwithstanding the boilerplate disclaimer of any changes in the Notice of Final Rulemaking, the reference to § 4204.10 in the final regulation could well have been the intentional correction of a typo, especially since the RHC had ample reason to require vacancy adjustments to be perfected like adjustments of general applicability rather than like other upward rent ceiling adjustments.

Especially when considering these uncertainties, we conclude that Sawyer should have raised its claim of a typographical error before the RHC. By not doing so, it has failed to make the record necessary to establish that the claim is correct. We see no sound reason to relieve Sawyer of the consequences of that failure.[20]

### III.

We cannot disturb the RHC's determination that Ms. Mitchell's rent increase did not implement a properly perfected adjustment of the rent ceiling on her apartment. As that determination is a sufficient independent basis on which to uphold the order under review,[21] we do not reach the other, alternative grounds on which the RHC rested its decision. The order of the RHC in this case is

*Affirmed.*

19. The publication of § 4207.5 in the District of Columbia Register and in the District of Columbia Municipal Regulations creates a rebuttable presumption that the regulation was properly issued and adopted. D.C.Code § 2–561. Neither Sawyer nor the amicus has contended that the final version of § 4207.5 is invalid because it differs from the version initially proposed, and we express no opinion on that unargued proposition. *See* D.C.Code § 2–553(f) (providing that "[i]f, after a proposed rule has been published initially in the District of Columbia Register, an agency decides to alter the initial text so that the proposed rule is substantially different from the initial text, the agency shall submit the altered text as though for initial publication."); *see also* D.C.Code § 2–505 (requiring notice and comment period before agency adoption of rule or amendment).

20. Indeed, Sawyer would not necessarily be entitled to relief even if we were to entertain its claim and conclude that vacancy adjustments are to be perfected in the manner set forth in § 4204.9 rather than § 4204.10. Section 4204.9 provides that a rent ceiling adjustment "shall be considered taken and perfected only if the housing provider has ... met the notice requirements of [D.C. Mun. Regs. tit. 14,] § 4101.6." The latter section requires the housing provider to furnish a copy of the amended registration form reporting the vacancy adjustment in question to the tenant of the affected rental unit. The record does not indicate that Sawyer ever complied with that requirement.

21. We also see no reason to question the hearing examiner's finding that the housing provider knew or should have known that it violated the regulations by charging excessive rent.