**Theodore J. PARRECO and Stephen Q. Parreco, Personal Representatives of the Estate of James Parreco, Petitioners,**

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION, Respondent.**

No. 03–AA–1488.

District of Columbia Court of Appeals.

Argued April 18, 2005.

Decided Oct. 27, 2005.

As Amended Dec. 6, 2005.

Roger D. Luchs, Washington, for petitioner.

Mary T. Connelly, Assistant Attorney General, with whom Robert J. Spagnoletti, Attorney General for the District of Columbia, and Edward E. Schwab, Deputy Attorney General, were on the brief, for respondent.

Vincent Mark J. Policy and M. Ryan Jenness were on the brief for the Apart-

ment and Office Building Association of Washington, as amicus curiae.

Before WASHINGTON, Chief Judge,[1] RUIZ and REID, Associate Judges.

RUIZ, Associate Judge:

Petitioner challenges the decision of the District of Columbia Rental Housing Commission ("RHC") affirming a determination by an examiner of the Office of Adjudication of the Department of Consumer and Regulatory Affairs that invalidated petitioner's rent increase for failure to give tenant the statutorily-required notice. The decision ordered a roll-back of the rent increase and imposed a fine of $1000 for an unlawful increase in rent. It also awarded the tenant reimbursement of two days' rent for a period when tenant's apartment had no heat, as well as a fine of $500 for petitioner's failure have given the tenant this statutorily-required reduction in rent.

We agree with petitioner that the decision invalidating the rent increase and imposing a fine was based on an issue the tenant never raised and of which petitioner had no adequate notice. We also agree that required findings were not made to justify imposition of the second fine. Thus, we reverse and remand to the agency for further proceedings.

**I.**

Hughes Denver Akassy (not a party to this case) was a tenant in a rent-controlled apartment building operated by petitioner.[2] The tenant and petitioner had had an adversarial and litigious relationship for some time, characterized by the tenant's chronic failure to pay rent, complaints against petitioner's allegedly poor maintenance of the apartment building, and frequent recourse to Landlord/Tenant Court.[3] In this latest round, the tenant filed a petition on January 14, 2002, with the Rental Accommodations and Conversion Division ("RACD") of the Department of Consumer and Regulatory Affairs, alleging that the landlord had imposed a discriminatory and retaliatory rent increase. The RACD uses a form petition on which tenants check off the nature of their complaint. In the section for "Complaints Involving Increases in Rent," the tenant checked off the box stating that "[t]he rent ceiling filed with the Rental Accommodations and Conversion Division for my ... unit[ ] is improper." In the comment area for this section he wrote:

I am a victim of discrimination by my landlord since I kept complaining about the poor condition of my apartment. The rent is more higher [sic] than other tenants on my floor who moved on [sic] after me. My landlord try [sic] to have

1. Chief Judge Washington was an Associate Judge at the time of oral argument. He became Chief Judge on August 6, 2005.

2. The petitioner, James Parreco, was president of the corporation that was the general partner of William Penn Apartments Limited Partnership, the entity that manages the apartment building. Mr. Parreco died during the course of this litigation. The personal representatives of his estate, Theodore and Stephen Parreco, have stepped into James Parreco's stead in order to pursue this appeal.

3. It appears that the tenant had been living in the apartment under a stay of eviction that

petitioner had secured in a separate proceeding based on nonpayment of rent. The trial court stayed the order on condition that the tenant pay rent in full and on time. The tenant stopped paying rent in protest of the rent increase involved in this case and, instead, paid it to the Registrar of the Superior Court. As a result of his nonpayment of rent, the trial court in the landlord/tenant case lifted the stay and ordered the tenant's eviction. That case is now also on appeal and pending before another division of this court. *Akassy v. William Penn Apartments Limited Partnership*, Nos. 02–CV–141 & 02–CV–291 (consolidated).

me evicted by incre[a]sing my rent by more than 20% this month. My ceiling (and my rent) are too high for the poor condition my apartment offer [sic].

In the section for Miscellaneous Complaints, the tenant also checked the box indicating "[r]etaliatory action has been directed against me[ ] by my[ ] Housing Provider ... for exercising [my] rights in violation of section 502 of the Rental Housing Emergency Act of 1985." In the comment area for Miscellaneous Complaints, he wrote, "and now [the landlord has] increased my rent from $879 to $1050," and alleged that the rent increase was in retaliation for the tenant's complaints about the condition of his apartment and discriminated against him on the basis of his French African race and ethnicity. In the "Additional Space" section, the tenant complained that his rent was "too high," that it was "improper," "ridiculous," and "a hostile judgment." He reiterated his claim that the rent increase was retaliatory and discriminatory, and that it was simply a means to force his eviction. Finally, in the "Services and/or Facilities" section, he complained that services had been either "permanently eliminated" or "substantially reduced" because he was without heat for two days in December 2001, his windows were broken, his wall paint was peeling, the radiator was loud, and the bathroom sink was broken.

In sum, the substance of the tenant's stated reasons for objecting to the rent increase were that it was (1) in retaliation for complaining about the poor condition of the apartment; (2) motivated by racial and ethnic discrimination; and (3) unjustifiable, given the poor condition of the apartment. Important for this appeal, the ten-ant did not check the box provided on the form for claiming that "[t]he rent increase was larger than the amount of increase which was allowed by any applicable provision of the Rental Housing Emergency Act of 1985," i.e., higher than the rent ceiling, nor did he check the box claiming that "[a] proper ... notice of rent increase was not provided" to him by the landlord. Nowhere in the petition did the tenant specifically claim that the rent increase violated the rent control law or that he did not have adequate notice of the increase and the reasons for it.[4]

An examiner of the Office of Adjudication of the Department of Consumer and Regulatory Affairs held a hearing on July 16, 2002, where the tenant appeared *pro se* and the landlord appeared with counsel. Consistent with the RACD form petition filed by the tenant, the examiner stated that the issues raised by the tenant's petition were whether the rent ceiling was too high given the poor quality of the facilities, and whether the rent increase was impermissibly retaliatory. In his opening statement, the tenant reiterated his retaliation and discrimination claims, stating that the landlord increased his rent every six months, while he increased the rent for other tenants only annually. He did not claim that his notice of rent increase was deficient, or that the increase was in excess of that authorized by statute. In his case-in-chief, the tenant reiterated the majority of his opening statement and petition. He did not call any witnesses or introduce any documents into evidence. On cross-examination by landlord's counsel, the tenant admitted that many of the problems of which he complained had long since been remedied, prior to the filing of

---

4. As noted, although the tenant checked the box that the rent ceiling was "improper," he did not give any explanation. At no time in the proceedings before the agency has there been a determination that the rent ceiling is improper, and no such claim is made before this court.

his petition. He denied, however, that the settlement agreement reached in an eviction proceeding required him to pay rent increases. *See supra* note 3.

In his opening statement, the landlord sought dismissal of the discrimination claim for lack of jurisdiction. Next, the landlord moved to dismiss any challenge to the rent increase on the basis that it was semiannual, because the law permits rent increases within 180 days of each other. The landlord then moved to dismiss the remainder of the tenant's petition on grounds that the settlement agreement to stay the eviction that had been ordered by Superior Court required the tenant to pay all rent increases. The examiner took the motion under advisement, but did not rule on it, and ultimately reached the merits of the petition. On direct examination by his attorney, the landlord stated that he understood that he had the right to increase the tenant's rent on a semi-annual basis, "within certain conditions of the law." He testified that he had brought a number of eviction proceedings against the tenant because he had been chronically late in paying rent and at times did not pay rent at all. On cross-examination by the tenant, the landlord explained that he increased the tenant's rent to offset the costs incurred in having to take legal action so often against the tenant to collect rent. The apartment building's engineer also testified that the heat had been off only once, when the boiler unexpectedly broke

down, but that it was fixed within five to six hours.

Based on the hearing testimony, the examiner issued a written Decision and Order on September 23, 2002. On the claims that the tenant raised in his petition, the examiner found mostly for the landlord. The examiner found no factual basis for the tenant's retaliation claim, and held that the RACD Rent Administrator had no jurisdiction to hear his discrimination claim. The examiner found no evidence that the rent *ceiling* had been unduly increased. The examiner also held that it was lawful for the landlord to impose a rent increase "as long as 180 days have elapsed from the previous rent increase." The examiner did find, however, that there had been no heat in the apartment building for two days in December 2001, as the tenant had claimed, and concluded that this "reduction was substantial."[5] As a result, the examiner found that the tenant was entitled to a two-day rebate of rent and imposed a $1000 fine because the landlord had not given tenant this rebate as he was required to do by law.

The examiner went on to find, moreover, that the rent increase was illegal because the notice of the increase given to the tenant was defective. While acknowledging that the tenant "did not check the category under 'Complaints Involving Increase in Rent' relating to a rent increase larger than the amount of increase that is allowed" by statute, the examiner noted that in the comment sections of the peti-

---

5. The examiner's decision and order is somewhat inconsistent on this point. In its discussion of this issue in section V of the order, the examiner finds that there was a two-day reduction in heat, and that such a "reduction was substantial." In paragraph three of the order's "Conclusions of Law," however, the examiner states that "[t]he Petitioner [tenant] has failed to prove ... that services ... have been ... substantially reduced ...." The examiner nevertheless goes on to conclude in

paragraph six that the landlord "acted knowingly and wil[l]fully in substantially reducing ... heat, and failing to reduce the rent proportionally." Since the examiner ultimately ordered a rebate on the rent and a fine based on the reduction of services, we construe paragraph three of the "Conclusions of Law" to be a clerical error and consider the findings and conclusions in section V to be controlling.

tion form, the tenant "did complain about his rent being too high, and that such rent was increased by more than 20%." Thus, the examiner concluded, the landlord was on notice from the petition that the validity of the notice of rent increase was an issue, and it therefore would not be a violation of the landlord's due process rights to reach the issue of the legality of the rent increase. The examiner found that the landlord's notice of the rent increase was insufficient because it failed to state the authorization, or legal basis, for the rent ceiling under which the rent increase was effected, as required by statute.[6] *See* D.C.Code § 42–3502.08(f) (2001) ("Any notice of an adjustment [*i.e.*, a rent increase under a rent ceiling] . . . shall

contain a statement of the current rent, the increased rent, and the utilities covered by the rent which justify the adjustment or other justification for the rent increase."); *see also* 14 DCMR 4205.4(a)(4) (the landlord shall provide notice of a rent increase which states, among other things, the "date and authorization for the rent ceiling" on which the rent increase is based).[7] The examiner therefore held that the rent increase was illegal, and ordered that the rent be rolled back to the pre-increase amount. He also fined the landlord $1000 for attempting to effect an illegal rent increase.

The landlord filed a motion for reconsideration challenging the examiner's deter-

---

**6.** Under the statute, an "adjustment in rent" means an increase in the rent *actually* charged. *See* § 42–3502.08(f) ("Any notice of an adjustment . . . shall contain a statement of the current rent [and] the increased rent . . . ."). A "rent ceiling adjustment" means an increase in the rent that *may* be charged, which must be approved by the RHC. *See* § 42–3502.06 (prohibiting a housing provider from charging rent in excess of the rate set by the RHC as the ceiling).

**7.** The Unitary Rent Ceiling Adjustment Act, D.C.Code § 42–3502.08(h)(1) (2001), controls the rent increases permissible under a given rent ceiling and provides that a landlord can only raise the rent under one rent ceiling at a time, or, as the statute puts it, each "adjustment [*i.e.*, increase] in rent . . . may implement not more than 1 authorized and previously unimplemented rent ceiling adjustment." A landlord may be granted multiple rent ceiling adjustments at one time, each for different reasons, *e.g.*, inflation or capital improvement, *see* D.C.Code § 42–3502.07, and need not fully exploit each new rent ceiling increase immediately, but can increase the rent toward a ceiling in stages, provided the landlord makes the increases no less than 180 days apart, and based on only one type of rent ceiling at a time. *See* D.C.Code § 42–3502.08(h)(2); see also *Sawyer Property Management v. D.C. Rental Housing Commission*, 877 A.2d 96, 103–04 (D.C. 2005) (explaining regulatory requirements, including that landlords must "perfect" rent ceiling adjustments before they may be implemented as rent increases). The

Act was enacted by the Council of the District of Columbia in 1992 to protect tenants from sudden, large increases in rent when RHC authorizes multiple types of rent ceiling adjustments effective simultaneously, multiple-ceiling rent increases having been upheld under an earlier version of the statute. *See* 39 D.C.Reg. 9005 (1992); *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n*, 550 A.2d 51, 52 (D.C. 1988) (upholding a single rent increase based on a combination of simultaneous rent ceiling increases).

14 DCMR 4205.4(a)(4) implements the Act by requiring notices of rent increase to state the date and authorization (*i.e.*, type) of the rent ceiling adjustment on which a rent increase is based in order to give the tenant notice of which rent ceiling adjustment is being implemented. This information protects tenants by exposing duplicative use of the same ceiling as well as rent increases based on more than one type of ceiling at a time. For example, a landlord that has available ceiling adjustments effective at the same time but for multiple reasons, *e.g.*, for inflation as well as capital improvement, may only implement each adjustment one at a time, and no less than 180 days apart, notifying the tenant of the date and the authorization for each ceiling implemented (*i.e.*, either the inflation or the capital improvement ceiling). Thus, the tenant would know when each ceiling had been exhausted, and that the rent was not being impermissibly increased based on both the inflation and the capital improvement ceilings together.

mination that the rent increase was illegal, as well as the sufficiency of the evidence of willfulness necessary to sustain imposition of the fine for not having abated the rent when the heat was off for two days. The landlord argued that the examiner's reasoning was flawed because it relied on an outdated regulation in finding the notice of rent increase insufficient. The landlord also noted a violation of his due process right by the examiner's introduction of this issue into the case, and argued that there was no evidence that the violations (assuming they were violations) were committed willfully, as required by statute, to justify imposition of a fine. The examiner reaffirmed his decision, holding that even under the current regulation the notice of rent increase was invalid,[8] and that a finding that the violation was committed intentionally, i.e., not accidentally, was sufficient to satisfy the element of willfulness. The examiner did, however, reduce from $1000 to $500 the fine for failing to abate the rent for the heat loss. The landlord appealed to the RHC, arguing that the examiner's decision based on the inadequacy of the rent increase notice violated his due process rights and that the fines were not justified. The RHC affirmed the examiner on all issues. The landlord then filed a petition for judicial review in this court.

## II.

■ This court must affirm an agency decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or procedure required by law. See D.C.Code § 2–510(a)(3)(A), (D) (2001). "We will not disturb the agency's decision if it flows rationally from the facts which are supported by substantial evidence in the record." Jerome Mgmt. v. District of Columbia Rental Hous. Comm'n, 682 A.2d 178, 181–182 (D.C.1996) (quoting Oubre v. District of Columbia Dep't of Employment Servs., 630 A.2d 699, 702 (D.C.1993)); see also D.C.Code § 2–510(a)(3)(E) (2001). "With respect to questions of law, 'we will uphold the agency's interpretation of the statute it is responsible for administering unless it is unreasonable in light of prevailing law, or conflicts with the statute's plain meaning or legislative history.'" Jerome Mgmt., 682 A.2d at 182 (quoting Oubre, 630 A.2d at 702). "However, if the agency's decision is based upon a material misconception of the law, this court will reject it." Id. (citing Madison Hotel v. District of Columbia Dep't of Employment Servs., 512 A.2d 303, 306 (D.C.1986)).

■ Petitioner claims that the RHC abused its discretion by basing its decision that the rent increase was unlawful on a cause for complaint that the tenant never raised, after dismissing the claims that the tenant had made. In support of its decision affirming the examiner, the RHC argues that the tenant generally raised the issue of the adequacy of the notice when he claimed that his rent was "too high." RHC further argues that, in the context of the tenant's objection to the rent increase, by answering the examiner's questions during the hearing about the reason for the rent increase, the landlord acquiesced to inclusion of the adequacy of the notice as an issue, and that it is undisputed that the notice of rent increase failed to state the date and authorization, or reason, for the rent ceiling under which the rent had

8. Even though the examiner had relied on an outdated version of the regulation, we agree that the current regulation requires landlords to state on a rent increase notice the "date and authorization for the rent ceiling" on which the rent increase is based. 14 DCMR 4205.4(a)(4); see supra note 7. The landlord's notice stated the rent ceiling, but not the date and authorization of the ceiling on which the rent increase in question was based.

been raised.[9] *See supra* note 7. We disagree. The tenant's complaint that the rent was "too high" was insufficient to alert the landlord to a challenge to the adequacy of the rent increase notice. The petition form specifically prompted the tenant to raise the issue of defective notice, but the tenant did not check the box to do so, nor did he mention anything about the notice in the narrative space of the petition. The tenant had the opportunity to raise this issue in his opening statement and in his case-in-chief, but did not. A petition must give a defending party fair notice of the grounds upon which a claim is based, so that the defending party has the opportunity to adequately prepare its defense and thus ensure that the claim is fully and fairly litigated. *See Autocomp, Inc. v. Publishing Computer Service, Inc.,* 331 A.2d 338, 340 (D.C.1975) (holding that pleadings in a complaint did not give defendant fair notice of a separate theory of recovery that plaintiff sought to prove at trial). Given the multitude of reasons why a tenant could complain that rent is unjustifiably high, and the specific reasons listed on the petition form (*e.g.,* retaliation, discrimination, poor condition of apartment), it is unreasonable to expect the landlord to have inferred a challenge to the adequacy of the notice of rent increase, and to have been prepared to defend on that ground.

■ By analogy to the permissive procedure for amending complaints in Superior Court Civil Procedure Rule 15(b), the RHC argues that the landlord impliedly consented to inclusion of that challenge during the hearing. Rule 15(b) "is an *attempt to favor substance over form . . .* and thus promote the resolution of cases on their merits by permitting the amendment of pleadings to reflect the actual litigation which transpired," provided all the parties either expressly or impliedly consented to try the issues encompassed by the amended pleadings. *Moore v. Moore,* 391 A.2d 762, 768 (D.C.1978) (internal quotations omitted). Since the landlord never expressly consented to try the issue of the adequacy of the rent increase notice, the RHC argues that the landlord, by his testimony on cross-examination, gave implied consent to try that issue. The test for implied consent is whether the evidence the RHC claims introduced the new issue had to have been recognized by the opposing party as "aimed at the unpleaded issue" alone. *Adler v. Abramson,* 728 A.2d 86, 91 (D.C.1999). "[O]nly if that evidence was 'clearly apposite to the new issue but not to other matters specified in the pleadings' could [the opposing party] be found to have had adequate notice and an opportunity to litigate it." *Id.* (quoting *Moore,* 391 A.2d at 768 (other internal quotations omitted)). Under the federal counterpart to Rule 15(b), a factfinder may not decide an issue, based on implied consent, that is only "inferentially suggested by incidental evidence in the record." *Cole v. Layrite Products Co.,* 439 F.2d 958, 961 (9th Cir.1971) (citing *Monod v. Futura, Inc.,* 415 F.2d 1170 (10th Cir.1969)); *see also* 6A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1493, at 32 (2d ed. 1990) ("[W]hen the evidence that is claimed to show that an issue was tried by consent is relevant to an issue already in the case, as well as to the one that is the

---

9. The landlord frames this as an error in the examiner's assignment of the burden of proof. Even if the tenant failed to carry his burden of proof, however, the landlord's admissions as a party opponent could still be considered by the factfinder as substantive evidence. *See* *Coalition for the Homeless v. D.C. Dep't of Employment Servs.,* 653 A.2d 374, 378 (D.C. 1995) ("[A]n admission by a party opponent is admissible as substantive evidence.") (citing *Chaabi v. United States,* 544 A.2d 1247, 1248 (D.C.1988)).

subject matter of the amendment, and there was no indication at trial that the party who introduced the evidence was seeking to raise a new issue, the pleadings will not be deemed amended.").

In *Cole*, for example, the plaintiff sued Layrite for the death of his parents caused by Layrite's truck, driven by a Layrite employee, swerving into oncoming traffic and hitting the parents' car. *See* 439 F.2d. at 959. The plaintiff had pled only negligence *per se*, and sought damages from the employer, Layrite, based on *respondeat superior*. *See id.* at 960. In defense, the employer introduced evidence that the driver of the truck had suffered an unexpected heart attack, which caused the accident. *See id.* The president of the company testified that, though the company knew of the driver's poor health, such an attack was unexpected. *See id.* at 960–61. Based on that testimony, the plaintiff sought, during closing argument to the jury, to introduce a new theory of recovery: negligent entrustment by the employer. *See id.* The trial court held, and the Ninth Circuit affirmed, that the plaintiff could not introduce to the jury the new theory of negligent entrustment because, though the testimony of the president of the employer could conceivably be apposite to a negligent entrustment claim, it had been offered as a defense to the theory of negligence *per se* on the part of the driver,

and therefore was not sufficiently distinguishable to justify amending the pleading on a theory of implied consent. *See id.* at 961.

■ Similarly in this case, the tenant expressly made claims other than the sufficiency of the notice of the rent increase. In his case-in-chief, the tenant pursued his claims of retaliation and discrimination, and repeatedly asked the landlord to explain the rent increase, which he deemed to be "too high." [10] The RHC bases its argument of implied consent on the landlord's statements on cross-examination that he decided to raise the tenant's rent in order to recoup his added collection costs caused by the tenant's delinquency and litigiousness. Neither the tenant nor the examiner questioned the landlord about the adequacy of the rent increase notice or the rent ceiling on which it was based. RHC's argument is that the landlord's replies to the examiner's questions about his reasons for raising the tenant's rent opened the door to questions about the validity of the rent increase notice, because such notices are supposed to state the basis for the authorization of the rent ceiling on which the increase is based, and the reason given by the landlord—recouping the cost of rent collection—is not a statutorily-recognized basis on which RHC grants rent ceiling increases. *See* D.C.Code § 42–3502.07 (providing bases

---

10. For example, the tenant asked, "Okay. Why you believe that my rent should be increased from $879 to $1,050?" The landlord replied that he raised the tenant's rent to compensate for the added difficulty the tenant cost him to collect rent. The tenant then asked, "[i]f it's not a retaliation of raising my rent, why say that you have to go through collection?" The landlord explained in greater detail that it was his business strategy to keep rents "a little below market rent" in order to maintain a reliable tenant base. Since the tenant here was not reliable, the landlord explained, there was no point to keeping his rent below market. The tenant then sought to have the landlord compare the rent he was charged with that paid by other tenants, *e.g.*, "is it true or not true that the tenant … who moved after me next door with the same one-bedroom apartment paid less than I pay, $850?" After the hearing examiner interjected his own questions about the landlord's purpose behind the rent increase, the examiner said he would permit the tenant to continue to question the landlord "because you have a retaliatory action claim."

for authorization of rent ceiling increases). The landlord's replies during cross-examination, however, viewed in the context of the claims made by the tenant, were made to rebut the charges of retaliation and discrimination, and thus were not "clearly apposite to the new issue but not to other matters specified in the pleadings." *Moore*, 391 A.2d at 768. The landlord's statement that he raised the tenant's rent to compensate for his added cost in collecting rent from him in no way addressed the question of the landlord's legal entitlement to do so under the applicable rent ceiling, or, even more removed, the question of whether the notice of rent increase adequately explained the basis for the rent ceiling adjustment on which the rent increase relied. Since the landlord was not fairly apprised that the adequacy of the notice of rent increase was at issue, the examiner abused discretion in finding that the rent increase in this case was illegal due to inadequate notice. The examiner's order rolling back the rent increase and imposing a $1000 fine for an illegal rent increase is reversed.[11]

■ We also note that the examiner's and the RHC's rather tortuous theory is grounded on the misconception that a landlord's only permissible reason for increasing rent has to be the same as that which authorized the rent ceiling adjustment on which the rent increase is based. This reasoning confuses the statutorily-based *authorization* for a rent ceiling increase, *e.g.*, to compensate for inflation or capital improvement, *see* D.C.Code § 42–3502.07(1), with the landlord's *motivation* for increasing the actual rent. A rent ceiling adjustment provides a landlord with

legal authorization to increase the rent. The parties do not dispute that the landlord had such authorization in the form of a rent ceiling of over $3800, well over the $1050 to which the rent rose after the increase in question. With such an authorization, the Rent Stabilization Act was no bar to increasing the rent, provided the landlord did so according to the statutorily-mandated procedures, *see supra* note 7, and did not do so for an impermissible purpose, such as retaliation against tenants for exercise of certain protected actions, and discrimination based on membership in a protected class (*e.g.*, race or ethnicity). *See* D.C.Code § 42–3505.02 (prohibiting rent increase for retaliatory purpose); § 2–1402.21(a)(1), (4) (prohibiting rent increase for the purpose of discriminating on the basis of race or national origin, among other protected classes). The examiner found that the rent increase was not retaliatory in violation of § 42–3505.02, and dismissed for lack of jurisdiction the tenant's charges of ethnic and racial discrimination. The RHC does not cite to any regulation or statute requiring that rent increases be imposed evenly on all tenants, and has not otherwise demonstrated that the landlord's purpose of recouping the costs incurred in collecting rent from a delinquent tenant was legally impermissible.

## III.

■ The RHC also abused discretion in sustaining the examiner's imposition of a rent rebate for the two days in December 2001 when the tenant's apartment had no heat and a $500 fine for the landlord's

---

11. We do not reach the question of whether defect of notice alone, without a showing of prejudice therefrom, would be sufficient to permit a roll-back of rent. *Cf. Nwankwo v. District of Columbia Rental Hous. Comm'n*, 542 A.2d 827 (D.C.1988). No evidence was adduced at the hearing to show that the tenant suffered any actual prejudice from any defect in the notice. Indeed, the RHC does not argue that the rent increase itself was unlawful, apart from any alleged defect in the notice. *See supra* note 4.

failure to previously give the rebate as was required by law. At the hearing, the tenant testified that he had no heat for two days in December 2001. The apartment building engineer corroborated that the boiler had broken down, but said it had been repaired within five to six hours. There was substantial evidence in the record, therefore, to sustain the examiner's finding that there was a substantial reduction in services. *See* D.C.Code § 42–3501.03(35) (defining substantial reduction in services as "any housing condition" in violation of a statute or regulation that "may endanger or materially impair the health and safety of any tenant or person occupying the property"). A tenant is not automatically entitled to a rebate, however, whenever there is a substantial reduction in services. The applicable housing regulation provides that when services or facilities are substantially reduced by "accident ... and are not promptly restored to the previous level, the housing provider shall promptly reduce the rent for the rental unit by an amount which reflects the monthly value of the decrease in related services or facilities." 14 DCMR § 4211.6. The regulation therefore does not mandate a refund of rent whenever, by accident, there is a substantial reduction in service, but rather only when the service is "not promptly restored to the previous level." In such cases, the Rent Administrator may impose a penalty on a landlord for failing to rebate rent accordingly. *See* 14 DCMR § 4211.6. Imposition of fines requires a

finding of a "willful[ ]" violation of a statute or regulation. D.C.Code § 42–3509.01(b) (2001).[12]

Although the examiner found that the two-day problem with the heat constituted a "substantial reduction" in services, he made no finding on whether the breakdown was unexpected and whether the repair was "prompt,"[13] or whether the landlord's failure to rebate the rent for two days was "willful;" the examiner merely concluded that because there was no heat for two days, the tenant was entitled to a two-day *pro rata* reduction in his rent.[14] The examiner's order that the landlord abate two days' rent and his imposition of a fine for the landlord's failure to do so on his own initiative was an abuse of discretion because these remedies were not based on fact findings applying the regulatory criteria. The order is reversed and the case remanded to the hearing examiner for findings on whether the breakdown was unexpected, the restoration of heat within two days was "prompt," and, if not, whether the landlord's failure to abate rent accordingly was "willful."[15]

*So ordered.*

---

**12.** D.C.Code § 42–3509.01(b) (2001) provides, in pertinent part, that "[a]ny person who willfully ... commits any ... act in violation of any provision of this chapter or of any final administrative order issued under this chapter ... shall be subject to a civil fine of not more than $ 5,000 for each violation."

**13.** There was no evidence presented to challenge the building engineer's testimony that the boiler broke down unexpectedly and that it was repaired in six hours. The examiner

did not expressly disbelieve the building engineer's testimony.

**14.** "[T]he [tenant] has proved that he was without a related service, *i.e.*, heat, for a two-day period ... and, therefore, was entitled to a reduction in the rent...."

**15.** In *Quality Management, Inc. v. D.C. Rental Housing Commission*, 505 A.2d 73, 75–76 n. 6 (D.C.1986), we noted the RHC's definitions of the standards of culpability in its regulations:

" '[w]illfully' goes to the intent to violate the law. 'Knowingly' is simply that you know what you are doing. A different standard. If you know that you are increasing the rent, the fact that you don't intend to violate the law would be 'knowingly.' If you also intended to violate the law, that would be 'willfully.' " *Id.; see also Hoskinson v. Solem*, T/P 27,673, at 4–5 (RHC July 20, 2005) (relying on RHC's definition of willfulness articulated in *Quality Management*).

In this case, however, the RHC articulated in its decision that "willful" means merely that the person intended to do the action that constitutes the violation, not necessarily that the person was conscious of the fact that it was a violation. Imposition of a fine in this case was an abuse of discretion even under the standard of culpability RHC applied here because the examiner made no finding that the landlord knew or should have known that the restoration of heat was not prompt, nor is it obvious on this record that it was not.