**CARILLON HOUSE TENANTS'
ASSOCIATION, Petitioner,**

v.

**DISTRICT OF COLUMBIA RENTAL
HOUSING COMMISSION,
Respondent,**

and

**Carillon House, L.P., Intervenor.**

No. 00–AA–874.

District of Columbia Court of Appeals.

Argued Dec. 13, 2001.
Decided March 14, 2002.
As Corrected May 1, 2002.

Eric M. Rome, Washington, DC, for petitioner.

Vincent Mark J. Policy, with whom Richard W. Luchs, Washington, DC, was on the brief, for intervenor.

Robert R. Rigsby, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Sheila Kaplan, Assistant Corporation Counsel, filed a statement in lieu of brief for the District of Columbia Rental Housing Commission.

Before WAGNER, Chief Judge, and FARRELL and WASHINGTON, Associate Judges.

FARRELL, Associate Judge.

Petitioner Carillon House Tenants' Association ("Tenants' Association") seeks review of a decision of the District of Columbia Rental Housing Commission ("RHC") authorizing a rent ceiling surcharge that would include three hundred months (or twenty-five years) of interest for recovery of the cost of a capital improvement loan obtained by intervenor Carillon House, L.P. ("Housing Provider"). The Tenants' Association contends that the statute in question, D.C.Code § 42–3502.10 (2001), formerly D.C.Code § 45–2520 (1996), allows only for recoupment of ninety-six months (or eight years) of interest on such loans. Because the plain language of the statute, together with corresponding regulations and the legislative history, provide for the recovery of total costs to include all interest specified by the terms of the capital improvement loan, we affirm.

## I. Background

At issue are two competing interpretations of Section 210 of the Rental Housing Act, which governs the entitlement of a housing provider to recover funds expended for capital improvements made to rental housing, without permanently increasing the base rent paid by tenants. That section, codified at D.C.Code § 42–3502.10(b)(2), requires that to receive approval for a rent ceiling surcharge, a housing provider must demonstrate to the Rent Administrator, *inter alia*, "[t]he amount and cost of the [capital] improvement including interest and service charges." [1] Once the housing provider has established the cost of the improvement, the Rent Administrator determines the rent ceiling surcharge, "[i]n the case of a building-wide improvement, by dividing the cost over a 96 month period of amortization and by dividing the result by the number of rental units in the housing accommodation," with no increase to exceed twenty percent of the current rent ceiling. D.C.Code § 42–3502.10(c)(1). The result is a temporary rent increase for the tenants that expires once the housing provider has recouped the money spent on the capital improvement. *See* D.C.Code § 42–3502.10(c)(3). The contested issue before us concerns whether the Rent Administrator must determine the rent ceiling surcharge based on the interest accrued during the life of the loan, or only during a ninety-six-month period.

In November of 1993 and March of 1994, the Housing Provider filed two separate Capital Improvement Petitions (CI 20,666 and CI 20,686) regarding the renovation, replacement and modernization of various fixtures of the Carillon House, a 488 unit rental apartment building located at 2500 Wisconsin Avenue, N.W. In anticipation of the capital improvements, the Housing Provider had secured a multi-purpose loan in the amount of $10,500,000.00 for a term of twenty-five years at an interest rate of 9.675%. It spent a portion of those funds,

---

**1.** We set out the relevant portions of § 42– 3502.10 in an Appendix to this opinion.

$131,375.10, to repair the building's chimney and to replace its oil tank (CI 20,666), while allocating an additional $587,240.00 [2] to modernize the building's elevator and common area air-conditioning systems, install a new trash compactor, upgrade the security system, and improve other equipment of the building (CI 20,686). Overall, the improvements would total $718,615.10 in expended principal.

In 1994, after the filing of the petitions, the District of Columbia Department of Consumer and Regulatory Affairs, Office of Adjudication ("OAD") held hearings to determine the rate of any rent ceiling surcharge. In CI 20,666, the hearing examiner totaled the cost of the capital improvement at $352,742.15, including $131,375.10 in principal, $218,082.67 in interest, and $3,284.38 in service charges. This calculation included the interest expected to accrue over the twenty-five-year loan term. As a result, the hearing examiner granted a monthly rent ceiling surcharge of $8.00 per unit. In CI 20,686, the examiner adopted the same calculation method with the resulting total cost of the capital improvements to be $1,576,996.84, including $587,240.00 in expended principal, $974,700.84 in accrued interest over twenty-five years, and $15,056.00 in service charges. The result was a monthly rent ceiling surcharge of $35.00 per unit. The Tenants' Association appealed both of these decisions to the RHC, challenging, *inter alia*, the calculation of interest included in the surcharge.

Although the RHC originally consolidated the petitions, an incomplete record required the remand of CI 20,666, leaving only CI 20,686 before the RHC. In its first decision and order, the RHC affirmed in part and reversed in part, holding that the Housing Provider could recover only the actual cost of the capital improvement, not the cost of the entire loan. In calculating the interest to determine the value of the actual cost, the RHC looked solely to the ninety-six-month period found in Section 42–3502.10(c)(1). On the Housing Provider's motion for reconsideration, the RHC affirmed this position because it believed the regulations effectively treated the tenants' obligation as the repayment of an eight-year "loan" made to them by the Housing Provider. Thus the statute required repayment of only ninety-six months of interest, the time during which the tenants assumed the capital improvement surcharge. One commissioner dissented, believing the statute mandated the recoupment of all interest incurred by the Housing Provider for the term of the loan it had obtained for the capital improvement.

On remand, the hearing examiner recalculated the rent ceiling surcharge to include only interest accrued over the ninety-six-month period, $258,972.83–a reduction of $715,728.01. This recalculation reduced the monthly surcharge to $18.00 per unit. The Housing Provider appealed to the RHC both this decision and the decision in CI 20,666, in which the hearing examiner had likewise calculated the rent ceiling surcharge by including eight years of interest, permitting recovery of approximately $57,840.00 in interest. That rent ceiling surcharge was therefore lowered to $4.00 per unit.

Before the RHC a second time, the parties contested only how much interest was properly included in the determination of the monthly surcharge. In this appeal,

---

**2.** The Housing Provider paid an additional $15,000.00 for asbestos removal, but the RHC disallowed recovery for this cost. The parties do not contest this result, and it has no bearing on the present calculations, which reflect interest accrued on $587,240.00, and not $602,240.00 as originally found by the hearing examiner.

the RHC altered its interpretation of the statute and reversed the earlier decision, holding that the ninety-six-month provision had no bearing on the determination of total interest, but applied only when computing the monthly rent ceiling surcharge. The statute, according to the RHC, operates as a cost-recovery mechanism enabling a housing provider to recoup all costs, including all interest, associated with capital improvements. Accordingly, it restored the monthly rent ceiling surcharge to $8.00 in CI 20,666 and $34.00[3] in CI 20,686. The chairperson, who had authored the RHC's first decision and order, dissented. This petition for review followed. *See* D.C.Code § 42–3502.19 (2001).

## II. Discussion

 "In reviewing the construction of a statute by the agency charged with its interpretation and enforcement, the agency's interpretation is controlling unless it is plainly erroneous or inconsistent with the statute." *Slaby v. District of Columbia Rental Hous. Comm'n,* 685 A.2d 1166, 1167 (D.C.1996). Both the agency and the court must look first to the plain and ordinary meaning of the statute, because normally "that is the meaning intended by the legislature." *Guerra v. District of Columbia Rental Hous. Comm'n,* 501 A.2d 786, 789 (D.C.1985). But "[w]hile statutory words are to be accorded their ordinary meaning absent indication of a contrary legislative intent[,] ... statutory meaning is ... to be derived, not from the reading of a single sentence or section, but from consideration of an entire enactment against the backdrop of its policies and objectives." *Gondelman v. District of Columbia Dep't of Consumer & Regulatory*

*Affairs,* 789 A.2d 1238, 1245 (D.C.App. 2002) (citation omitted).

According to the Housing Provider and the RHC, the proper calculation of the rent ceiling or capital improvement surcharge involves a two-step process. The first step, in accordance with Section 42–3502.10(b)(2), is to determine the total cost of the improvements, comprising the actual principal expended on the capital improvement, the interest expected to accrue on that capital over the life of the loan, and any service fees charged to the housing provider. The second step, dictated by Section 42–3502.10(c)(1), is to divide the total cost by ninety-six months and then divide the result by the number of rental units in the housing accommodation.

The Tenants' Association relies on a different formula for the first step. It regards the statute as requiring calculation of the interest as though the housing provider had obtained a loan with a ninety-six-month term and passed it through to the tenants. Under this theory, the total cost of the improvements would include the amount of the principal expended and the interest on that principal over a ninety-six-month amortization period, plus any service charges. The resulting figure would be divided by ninety-six months (to represent the building-wide monthly payment) and again be divided by the number of units. The Tenants' Association derives this reading from the word "amortization" in subsection (c)(1), together with the word "loan" found in the regulations; in combination these treat the tenants as if they are repaying a loan which the housing provider has made to them.[4] Allowing the

---

**3.** Nothing in the RHC's decision indicates why this value is one dollar lower than that originally determined by the hearing examiner.

**4.** *See* 14 DCMR § 4210.19(a) (2001) ("In computing the rent ceiling surcharge the housing provider shall ... [d]etermine the monthly payment required to amortize, over a calculation period of ninety-six (96) months, a

housing provider to recover the principal while collecting an additional seventeen years' worth of interest, petitioners argue, unfairly enriches the landlord by allowing it the use of (in this case) potentially seventeen years of interest prepaid by the tenants.

■ Although the tenants' position has some appeal, the RHC correctly rejected it because it does not provide the housing provider with recovery of all costs associated with the capital improvement in the manner prescribed by the statute. Section 42 3502.10(b)(2), together with its supporting regulations, demonstrates the reasonableness of the agency's determination that the statute authorizes recovery of the total interest on a capital improvement loan, not merely eight years' worth.

D.C.Code § 42–3502.10(b)(2), as stated, permits the housing provider to recover the "amount and cost of the improvement including interest and service charges." The regulations define interest as *"all compensation* paid by the housing provider to a lender for the use, forbearance or detention of money used to perform a capital improvement." 14 DCMR § 4210.40(a) (emphasis added). On its face the definition contains no ninety-six-month limitation, but rather contemplates the inclusion of all interest payable by the landlord on a capital improvement loan. Title 14 DCMR § 4210.41(a) confirms this point:

[t]he amount of interest which shall be includable by the housing provider in a capital improvement petition for purposes of [determining the rent ceiling surcharge] shall be ... the amount of interest *payable by the housing provider at a fixed rate of interest on a loan of money used to perform the capital improvement* or on that portion of a multi-

purpose loan of money used to perform the capital improvement as documented by the housing provider *by means of the relevant portion 'of a bona fide loan commitment or agreement with a lender* .... [Emphasis added.]

Title 14 DCMR § 4210.20 further explains that "the ninety-six month period ... shall be *solely* applicable to the calculation of the monthly amount of the rent ceiling surcharge and [is] not to be [a] factor[ ] in determining the permitted duration of a capital improvement rent ceiling surcharge or rent increase." 14 DCMR § 4210.20 (emphasis added). Because the eight-year period applies only to calculation of the monthly rent ceiling surcharge, it has no bearing on the amount of interest includable in the cost of a capital improvement.

The statutory structure also supports this conclusion. Subsection (b) of § 42–3502.10 authorizes the inclusion of interest when totaling the overall cost of the capital improvement. The ninety-six-month period, on the other hand, appears in subsection (c)(1) which concerns the computation of the monthly surcharge, a calculation that takes place only after the amount and cost of the capital improvement has been tallied. At the same time, subsection (c)(3) provides that:

[i]n the case of a rent increase included as part of the rent ceiling or base rent for a capital improvement after October 19, 1989, the rent increase is temporary and is abated as to each tenant *upon recovery of all costs of the capital improvement, including interest* and service charges. The rent increase shall not be calculated as part of either the base rent or rent ceiling of a tenant when determining the amount of the rent charged. When the housing provider has recovered *all costs, including*

loan in an amount equal to the total costs of the capital improvements, including ... inter-

est on the loan at the rate determined in accordance with § 4210.41.").

*interest* and service charges, the housing provider shall recompute and adjust the rent charged to reflect the abatement of the capital improvement rent increase. [Emphasis added.]

Thus, the language "all costs of the capital improvement, including interest" plainly requires the inclusion of all interest associated with the capital improvement loan in the rent ceiling surcharge, regardless of the term of the loan. The corresponding regulation allows the housing provider to continue collecting the rent ceiling surcharge if, at the end of the eight-year period, it has "not actually recovered in collected rent all costs of the capital improvements, including interest...." 14 DCMR § 4210.30.

Finally, the legislative history confirms the Council's intent to permit recovery of all interest as part of the cost of capital improvements, without limitation by the ninety-six-month period. As enacted in 1985, the Rental Housing Act barred the collection of any interest and service charges when determining the cost of a capital improvement.[5] The 1985 version of the statute also provided a seventy-two-month period of amortization over which to calculate the rent ceiling adjustment.[6] Under this version, however, a housing provider obtained a permanent base rent adjustment as a result of any capital improvements. In 1989, the Council substantially amended the statute, in significant part to address the concern over the permanency of the rent adjustment.[7] In addition to making increases in base rent adjustments temporary, the statute added interest and service charges to the recoverable cost of capital improvements,[8] a change that allowed housing providers to recoup all costs associated with the capital improvement; the amortization period was expanded from seventy-two to ninety-six months.[9] The intent of the amendments was summed up by the legislation's sponsor as follows:

This bill directs that capital improvement recovery costs will be just that: the recovery of all costs. After *complete* recovery—including debt service—takes place the amortized monthly amount will be eliminated from the rent payment. It will *never* be included as part of the rent base for other legitimate rent increases. In effect, under this legislation the amount assessed tenants for capital improvements becomes a temporary surcharge-separate from regularly calculated rent payments. The bill does not seek to cap the length of time necessary for recovery so that complete recovery may take place. To lessen the immediate monetary impact on tenants, the bill expands the period to be used by the

**5.** *See* Rental Housing Act of 1985, D.C. LAW 6–10, § 210, 32 D.C.REG. 3089, 3107 (1985) (codified at D.C.Code § 45–2520(b)(2) (1986) ("The housing provider shall establish to the satisfaction of the Rent Administrator: ... (t)he amount and cost of the improvement exclusive of interest and service charges....")).

**6.** *See id.* ("In the case of a building-wide major capital improvement, [the rent ceiling adjustment is determined] by dividing the costs over a 72 month period of amortization and by dividing the result by the number of rental units in the housing accommodation.").

**7.** *See* COUNCIL OF D.C., COMM. ON CONSUMER AND REGULATORY AFFAIRS, REPORT ON BILL 8–106: RENTAL HOUSING ACT OF 1985 CAPITAL IMPROVEMENTS AMENDMENT ACT OF 1989, at 2 (1989) (enacted as D.C. LAW 8–48). As a result, the Council included what is now Section 42–3502.10(c)(3).

**8.** *See* Rental Housing Act of 1985 Capital Improvements Amendment Act of 1989, D.C. LAW 8–48, 36 D.C.REG. 5788, 5788 (1989) (codified at D.C.Code § 45–2520(b)(2) (1996)).

**9.** *See id.* (codified at D.C.Code § 45–2520(c)(1) (1996)).

rent administrator when determining the monthly surcharge by two years (from six to eight years).[10]

Contrary to petitioners' claim, reading the statute to permit recovery of all interest contemplated by the capital improvement loan does not contradict the meaning of "amortiz[ation]" in the statute and supporting regulation. To "amortize" means "to liquidate (a debt, such as a mortgage) by installment payments" or "to write off an expenditure for (office equipment, for example) by prorating over a certain period." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 62 (3d ed.1992). In this sense, "amortization" describes the process by which the total amount of the capital improvement, including interest, is distributed proportionally over a ninety-six-month period. It does not reduce the cost owed by the tenants to the housing provider by virtue of a hypothetical pass-through loan to the tenants of that limited duration.

Furthermore, petitioner's argument that the housing provider will have effectively repaid the principal on the capital improvement loan after eight years presumes that the surcharges collected will aggregate to that amount. Although this scenario is possible, various factors (including apartment vacancies) make the housing provider's ability to prepay the loan less than a sure thing. More important, nothing (except perhaps marketplace demand) requires a housing provider to prepay the lender in a manner different from the terms of the loan. Should the housing provider choose that option, several tenant protections exist. If a landlord pays the entire principal early, the statute requires the rent surcharge to terminate, provided that the landloard has recovered the principal together with the interest actually occured on the loan by the date of payoff. *See* D.C.Code § 42–3502.10(c)(3) ("When the housing provider has recovered all costs, including interest and service charges, the housing provider shall recompute and adjust the rent charged to reflect the abatement of the capital improvement rent increases."). If the loan does not remain outstanding for its entire term, the tenants may be able to seek recovery of any unearned interest.[11] Finally, the twenty percent cap on rent ceiling surcharges, D.C.Code § 42–3502.10(c)(1), and the requirement that a housing provider file a Certificate of Continuation, 14 DCMR §§ 4210.31–.38, further safeguard the tenants against any exploitation of the surcharge.[12] In the absence of prepayment, however, the building's tenants will not overpay seventeen years worth of interest; instead, they will provide funds equal to "the amount of interest *payable* by the housing provider at a fixed rate of interest ... on that portion of a multipurpose loan of money used to perform the capital improvement." 14 DCMR § 4210.41(a) (emphasis added). Petitioner's additional concern that the landlord receives the use of the tenants' money for

---

10. *Capital Improvements Amendment Act of 1989: Hearing on Bill 8–106 Before the Comm. on Consumer and Regulatory Affairs* (D.C. 1989) (introductory remarks of Councilmember James E. Nathanson) (emphasis in original).

11. We make no determination whether such a suit, after administrative exhaustion, *see* D.C.Code § 42–3509.01(a)(1), would be successful in the District of Columbia. We note, however, that other jurisdictions have allowed the equitable recovery of unearned interest paid in advance when the loan does not run

the full term. *See, e.g., Aardwoolf Corp. v. Nelson Capital Corp.,* 861 F.2d 46 (2d Cir. 1988).

12. Additional protection for the tenants may be provided by 14 DCMR § 4210.42 (incorporating 14 DCMR § 4210.43), which requires reduction of the surcharge in specific circumstances. The parties each, though for very different reasons, suggest that this regulation may contradict the statute, but we have no occasion to consider its application in this case.

some length of time beyond the eight-year period is one properly addressed to the legislature.

*Affirmed.*

## APPENDIX

**§ 42–3502.10. Petitions for capital improvements.**

(a) On petition by the housing provider, the Rent Administrator may approve a rent adjustment to cover the cost of capital improvements to a rental unit or housing accommodation if:

(1) The improvement would protect or enhance the health, safety, and security of the tenants or the habitability of the housing accommodation; or

(2) The improvement will effect a net saving in the use of energy by the housing accommodation, or is intended to comply with applicable environmental protection regulations, if any savings in energy costs are passed on to the tenants.

(b) The housing provider shall establish to the satisfaction of the Rent Administrator:

(1) That the improvement would be considered depreciable under the Internal Revenue Code (26 U.S.C.);

(2) The amount and cost of the improvement including interest and service charges; and

(3) That required governmental permits and approvals have been secured.

(c) Any decision of the Rent Administrator under this section shall determine the adjustment of the rent ceiling:

(1) In the case of building-wide major capital improvement, by dividing the cost over a 96 month period of amortization and by dividing the result by the number of rental units in the housing accommodation. No increase under this paragraph may exceed 20% above the current rent ceiling;

\* \* \* \*

(3) In the case of a rent increase included as part of the rent ceiling or base rent for a capital improvement after October 19, 1989, the rent increase is temporary and is abated as to each tenant upon recovery of all costs of the capital improvement, including interest and service charges. The rent increase shall not be calculated as part of either the base rent or rent ceiling of a tenant when determining the amount of rent charged. When the housing provider has recovered all costs, including interest and service charges, the housing provider shall recompute and adjust the rent charged to reflect the abatement of the capital improvement rent increase.