**DORCHESTER HOUSE ASSOCIATES LIMITED PARTNERSHIP,**
Petitioner,

v.

**DISTRICT OF COLUMBIA RENTAL HOUSING COMMISSION,**
Respondent.

No. 04–AA–1100.

District of Columbia Court of Appeals.

Argued June 7, 2007.

Decided Dec. 20, 2007.

Roger D. Luchs, with whom Richard W.
Luchs and Vincent Mark J. Policy, Wash-

ington, DC, were on the brief, for petitioner.

Edward E. Schwab, Deputy Solicitor General at the time of argument, with whom Eugene A. Adams, Interim Attorney General for the District of Columbia at the time the brief was filed, and Todd S. Kim, Solicitor General, were on the brief, for respondent.

Before RUIZ, FISHER and THOMPSON, Associate Judges.

THOMPSON, Associate Judge:

On November 2, 2001, Dorchester House Associates Limited Partnership ("Dorchester") filed a capital improvement petition with the Rent Administrator of the Department of Consumer and Regulatory Affairs ("DCRA"), seeking an increase in the rent ceiling for units in Dorchester House, a rent-controlled apartment building owned by Dorchester and located at 2480 16th Street, N.W. A DCRA administrative law judge ("ALJ") approved the petition, but the District of. Columbia Rental Housing Commission (the "RHC" or the "Commission") reversed the ALJ's ruling and denied Dorchester's request for approval of a capital improvement surcharge.[1] Dorchester petitioned this court for review of the RHC decision, contending that the decision was inconsistent with the Rental Housing Act insofar as it required a pre-petition inspection of all rental units in Dorchester House—the basis for a statutory presumption that the building was in substantial compliance with the housing code—as a condition of approval of Dorchester's capital improvement petition. Dorchester also contends that the RHC decision should not be given effect because it upset Dorchester's expectations based on the Rent Administrator's customary practice in reviewing and approving capital improvement petitions.

We reject Dorchester's argument that the RHC was without authority to require a showing of Dorchester House's presumptive or actual substantial compliance with the housing code as a condition of approval of Dorchester's capital improvement petition. However, we agree with Dorchester that the RHC too narrowly applied the applicable statute and regulation (i.e., by requiring an inspection of the housing accommodation within the 30–day pre-petition period as a condition of petition approval, rather than recognizing that such a pre-petition inspection was an option available to the housing provider, to take advantage of a statutory presumption of housing code compliance in connection with the filing of a petition for a rent ceiling adjustment). We also are persuaded that the RHC's decision upset Dorchester's reasonable expectations based on the Rent Administrator's past practice with respect to what documentation is required in connection with capital improvement petitions. We conclude that this matter must be remanded so that Dorchester will have an opportunity to present evidence bearing on whether Dorchester House is, presumptively or actually, in substantial compliance with the housing code.

**Statutory and Regulatory Background**

In our opinion in *Sawyer Prop. Mgmt. of Md., Inc. v. District of Columbia Rental Hous. Comm'n,* 877 A.2d 96 (D.C.2005), we described as follows the rent-control scheme established by the version of the Rental Housing Act (the "Act") in effect during the period in issue here:

> A large proportion of rental housing in the District of Columbia is subject to the comprehensive regulatory scheme com-

---

1. The RHC's decision refers to the ALJ's ruling as a decision and order of the Rent Administrator, and we do so as well in the balance of this opinion.

monly known as rent control.... Briefly put, the goal of this scheme, born of a perceived severe housing shortage in the District, is to ensure that decent, affordable housing is available for the various sectors of the population, while at the same time landlords are allowed a fair rate of return on their investments.... Under the rent control laws, the principal protections for tenants are the imposition of a rent ceiling and the prohibition against upward adjustment of that ceiling except on specifically enumerated grounds.... The rent ceiling operates as an upper bound on the amount of rent that a housing provider is allowed to charge a tenant. A rent ceiling is established for each rental unit by starting with a "base rent," ... and adding any "duly authorized" upward adjustments that are permitted from time to time.... In order to obtain one of the several upward rent ceiling adjustments authorized by law, a housing provider ... must either petition for, or report its election to take, the rent ceiling adjustment in a timely and appropriate manner, and it must provide appropriate notification to tenants who may be affected by the adjustment.

*Sawyer,* 877 A.2d at 103 (internal quotation marks and citations omitted); *see also* D.C.Code § 42–3501.01 (2001) (legislative findings).

The provisions of the Act that govern the matter before us are set out in the 2001 edition of the D.C.Code (and, unless otherwise indicated, all references in this opinion to the D.C.Code are to the 2001 edition).[2] D.C.Code § 42–3502.08, entitled "Increases above base rent," provided in pertinent part that,

(a) (1) Notwithstanding any provision of this chapter, the rent for any rental unit shall not be increased above the base rent unless:

 (A) The rental unit and the common elements are in substantial compliance with the housing regulations ...

 ....

(b) A housing accommodation and each of the rental units in the housing accommodation shall be considered to be in substantial compliance with the housing regulations if:

(1) For purposes of the adjustments made in the rent ceiling in §§ 42–3502.06 and 42–3502.07, all substantial violations cited at the time of the last inspection of the housing accommodation by the Department of Consumer and Regulatory Affairs before the effective date of the increase were abated within a 45–day period following the issuance of the citations or that time granted by the Department of Consumer and Regulatory Affairs, and the Department of Consumer and Regulatory Affairs has certified the abatement, or the housing provider or the tenant has certified the abatement and has presented evidence to substantiate the certification. No certification of abatement shall establish compliance with the housing regulations unless the tenants have been given a 10–day notice and an opportunity to contest the certification; and

(2) For purposes of the filing of petitions for adjustments in the rent ceiling as prescribed in § 42–3502.16, the housing accommodation and each of the rental units in the housing accommodation shall have been inspected at the request of each housing provider by the Depart-

---

**2.** In 2006, the D.C. Council enacted a number of amendments to the Act. *See* 53 D.C.Reg. 4889 (2006). Among other things, the amendments generally eliminated use of the term "rent ceiling," substituting the term "rent charged" in several sections of the Act. *See* D.C. Law 16–145, §§ 2(a) and (c), 53 D.C.Reg. at 4889, 4890.

ment of Consumer and Regulatory Affairs within the 30 days immediately preceding the filing of a petition for adjustment.

D.C.Code § 42–3502.08(a)(1)(A) and (b)(1)-(2) (2001).[3]

D.C.Code § 42–3502.10 provided in pertinent part that:

(a) On petition by the housing provider, the Rent Administrator may approve a rent adjustment to cover the cost of capital improvements to a rental unit or housing accommodation if:

(1) The improvement would protect or enhance the health, safety, and security of the tenants or the habitability of the housing accommodation;

. . . .

(b) The housing provider shall establish to the satisfaction of the Rent Administrator:

(1) That the improvement would be considered depreciable under the Internal Revenue Code (26 U.S.C.S.);

(2) The amount and cost of the improvement including interest and service charges; and

(3) That required governmental permits and approvals have been secured.

. . . .

(g) The housing provider may make capital improvements to the property before the approval of the rent adjustment by the Rent Administrator for the capital improvements where the capital improvements are immediately necessary to maintain the health or safety of the tenants.

. . . .

(i) The housing provider may petition the Rent Administrator for approval of the rent adjustment for any capital improvements made under subsection (g) of this section, if the petition is filed with the Rent Administrator within 10 calendar days from the installation of the capital improvements.

D.C.Code § 42–3502.10 (2001).

The regulation that the RHC promulgated to implement the foregoing statutory provisions is codified at 14 DCMR Part 4216. In pertinent part, it provides that:

4216.1 Each petition for a rent ceiling adjustment ... shall be considered a petition to increase rent, and the Rent Administrator may consider whether the rental unit and common elements of the housing accommodation are in substantial compliance with the housing code.

. . . .

4216.3 In a hearing on a housing provider's petition for a rent ceiling adjustment, there shall be a rebuttable presumption of substantial compliance with the housing regulations for each rental unit and the common elements of a housing accommodation, if the following applies:

(a) The housing accommodation was last inspected for housing code violations more than thirty (30) days prior to the date of filing of the petition for adjustment, and all substantial violations then cited have been abated within the time set forth in the notice of violations; or

(b) The housing accommodation shall have been inspected at the housing provider's request within thirty (30) days

---

**3.** D.C.Code § 42–3502.07, which was referenced in section 42–3502.08(b)(1), provided in pertinent part that "[t]he rent ceiling for a particular rental unit ... may be increased ... (1)[a]ccording to 42–3502.10 to allow for the cost of capital improvements." D.C.Code § 42–3502.16, which is referenced in section 42–3502.08(b)(2), described the process for submitting a capital improvement petition.

immediately preceding the date of filing of the petition for adjustment.

14 DCMR §§ 4216.1, 4216.3 (1991).

**Factual and Procedural Background**

In August 2001, contractors retained by Dorchester began work replacing Dorchester House's boiler # 2. Dorchester's capital improvement petition explained that the emergency work was necessary to ensure that tenants would have adequate hot water and adequate heat during the ensuing winter. Dorchester sought approval for a capital improvement surcharge of three dollars per unit to recover the cost of the new boiler. Before filing its petition, Dorchester requested a housing code inspection. The DCRA Housing Inspection Division inspected many units on October 3, 2001, and, on the basis of that inspection and inspections conducted during September 2001, issued Housing Deficiency Notices that cited housing code infractions in 148 apartment units. The record does not make clear how many of the apartment building's 394 units DCRA actually inspected on October 3, 2001, or why some units were not inspected, but the parties agree that not all units were inspected on that date and also that not all units were inspected within thirty days before Dorchester filed its (November 2, 2001) petition.

Tenants opposed Dorchester's petition, and a hearing on the petition was held on July 24, 2002. Thereafter, in an October 4, 2002 Decision and Order, the Rent Administrator found that Dorchester's petition met all the requirements of the Act and approved the requested rent ceiling increase. The Rent Administrator accepted into evidence a "Certificate of Inspection," signed by Dorchester's Lease and Rent Control Administrator, which certified that the DCRA Housing Inspection Division conducted an inspection of Dorchester House on October 3, 2001. The

Rent Administrator also admitted into evidence the Housing Deficiency Notices referenced above. The Rent Administrator found that Dorchester "had the housing accommodation inspected for housing code violations within 30 days of filing the petition." Acknowledging the tenants' argument that "at best only 148 apartments were inspected and some of them were inspected on [dates that were] not within 30 days of the petition filing," the Rent Administrator reasoned that an inspection within 30 days of the petition filing date was not required before the capital improvement petition could be approved. The Rent Administrator reasoned that the provisions of D.C.Code §§ 42–3502.08(a) and (b)

> together ... stand for the proposition that before ... a rent increase can be imposed[,] the rental unit must be in substantial compliance with the housing regulations and the rental unit will be presumed to be in substantial compliance if it is inspected within 30 days of the filing of the petition for adjustment. Thus only if the housing provider wants to take advantage of that presumption does he have to have all his rental units inspected 30 days before he files the petition. The inspection within 30 days of filing the petition is not a condition precedent to the approval of the petition.

Rent Administrator's Decision and Order at 12.

The RHC disagreed. In a decision dated August 31, 2004, the RHC explained that it had "counted the units in the Housing Deficiency Notices which had inspection dates within the 30 days immediately preceding the filing of the capital improvement petition on November 2, 2001," and had found that "255 units ... were either not inspected or there was no proof of inspection 30 days prior to the filing of the capital improvement petition." The RHC

held that a "partial inspection ... does not satisfy the Act's requirement that each rental unit be inspected within the 30 days preceding the filing of the petition." The RHC denied the requested capital improvement surcharge because of the "failure of the Housing Provider to prove each rental unit was inspected in compliance with the Act."

**Standard of Review**

 This court gives "considerable deference to the RHC's interpretation of the statutes it administers and the regulations it promulgates." *Sawyer,* 877 A.2d at 102–03 (D.C.2005) (internal citations and quotations omitted). We will "sustain the RHC's interpretation of those statutes and regulations unless it is unreasonable or embodies a material misconception of the law, even if a different interpretation also may be supportable [unless] the challenging party [can] show that [the RHC's interpretation] is plainly wrong or incompatible with the statutory purpose." *Id.* When the interpretation of a statute is at issue, "[b]oth the agency and the court must look first to the plain and ordinary meaning of the statute, because normally that is the meaning intended by the legislature." *Carillon House Tenants' Ass'n v. District of Columbia Rental Hous. Comm'n,* 793 A.2d 461, 464 (D.C.2002) (internal quotations and citations omitted). In so doing, "statutory meaning is to be derived, not from the reading of a single sentence or section, but from consideration

of an entire enactment against the backdrop of its policies and objectives." *Id.*

**Analysis**

1. **Whether an Inspection Within the 30–Day Pre–Petition Period Was Mandatory**

 Dorchester asks us to reverse the RHC's ruling, arguing that the RHC decision "impos[es] a mandatory inspection requirement which does not exist in the statute." We agree.[4] By its plain language, D.C.Code § 42–3502.08 (2001) did not impose an inspection requirement. Rather, it stated in § 42–3502.08(b), that, for purposes of rent ceiling adjustments, "[a] housing accommodation and each of the rental units in the housing accommodation shall be considered to be in substantial compliance with the housing regulations" if either (i) there is a certification that all substantial housing code violations cited at the last inspection before the effective date of a rent ceiling increase were corrected within 45 days or such other time specified by DCRA, *see id.,* § 42–3502.08(b)(1), or (ii), "the housing accommodation and each of the rental units [therein] shall have been inspected at the request of the housing provider within the 30 days immediately preceding the filing of a petition for adjustment." *Id.,* § 42–3502.08(b)(2). Section 42–3502.08(b)(2), did *not* state— nor, we conclude, did it imply—that a complete inspection within the 30 days preceding the filing of a capital improvement

4. We also agree with the parties that the issue of the mandatory nature of the pre-petition inspection described in D.C.Code § 42–3502.08(b)(2) was not an issue before this court in *Tenants of 500 23rd Street, N.W. v. District of Columbia Rental Hous. Comm'n,* 585 A.2d 1330 (D.C.1991), and therefore that the panel's decision in that case "does not foreclose the Court from deciding the issues in this case." This is notwithstanding the statements in that opinion that "under § 45–2518 [recodified as § 42–3502.08], 'substan-

tial compliance' ... is defined to include the *requirement* that a housing accommodation had been inspected by the Department of Consumer and Regulatory Affairs within the 30 days immediately before the filing of a petition for adjustment in the rent ceiling," 585 A.2d at 1333 (italics added), and that "henceforth the Commission will require satisfaction of the inspection *requirement* before capital improvement petitions may be granted." *Id.* at 1333–34 (italics added).

petition (a "pre-petition inspection") was the *sine qua non* of approval of a petition to increase the rent ceiling for units within a housing accommodation.[5] We agree with Dorchester that section 42–3502.08(b)(2), merely established a presumption of housing code compliance for any housing provider that had all of the rental units in its housing accommodation inspected within 30 days before the provider filed a petition for a rent ceiling adjustment. By having its housing accommodation undergo a pre-petition inspection, a housing provider did not avoid the obligation of actual substantial compliance with the housing code;[6]

explicitly, the presumption of housing code compliance described in D.C.Code § 42–3502.08(b)(2) was for the limited purpose of obtaining approval of a petition for a rent-ceiling increase. However, by submitting its housing accommodation to a current inspection, the housing provider was able to avail itself of a (relatively) streamlined petition-approval process, because the petition could be approved notwithstanding housing code violations listed on the pre-petition inspection report (and any other violations identified by tenants) that had not yet been abated at the time the petition was processed.[7]

5. The RHC's contrary interpretation, that section 42–3502.08(b)(2) (2001), established an inspection "requirement," not only misinterprets the statute but also is at odds with the RHC's own regulation at 14 DCMR § 4216.3. The regulation lists an inspection of all rental units within a housing accommodation within the 30–day period preceding the filing of a rent-ceiling-increase petition as one of two *options* by which a housing provider may take advantage of a "rebuttable presumption" of substantial compliance with the housing code: (i) if the housing accommodation "was last inspected for housing code violations more than thirty (30) days prior to the date of filing of the petition for adjustment, and all substantial violations then cited have been abated within the time set forth in the notice of violations," 14 DCMR § 4216.3(a); or (ii) if the housing accommodation "shall have been inspected at the housing provider's request within thirty (30) days immediately preceding the date of filing of the petition for adjustment." 14 DCMR § 4216.3(b).

 We note that the RHC treated pre-petition inspections as mandatory not only in its decision in the instant case, but also in its decisions in *Columbia Plaza Ltd. P'ship v. Tenants of 500 23rd St., N.W.*, CI 20,266 (RHC Nov. 9, 1989), and *Tenants of 1709 Capitol Ave., N.E. v. 17th & L St. Prop.*, HP 20,328 (RHC Dec. 15, 1987). But "an agency adjudication cannot stand if ... it ... violates a statute...." *Seman v. District of Columbia Rental Hous. Comm'n*, 552 A.2d 863, 866 (D.C.1989) (citing *Washington Times v. District of Columbia Department of Employment Servs.*, 530 A.2d 1186, 1189–90 n. 7 (D.C.1987)).

6. An inspection, we note, triggers a requirement to abate any violations found during the inspection, by a time specified in any resultant Housing Deficiency Notice. *See* 14 DCMR § 102.1. Thus, arranging an inspection may obligate the housing provider to do more than merely open its doors to Housing Division inspectors.

7. *See Tenants of 1915 Kalorama Rd. N.W. v. Columbia Realty Venture*, CI 20,630 and 20,653 (RHC March 28, 1997) (holding that the Rent Administrator "did not err in granting the capital improvement petition while housing code violations [identified on pre-petition housing inspection reports] existed at the housing accommodation"); *Tenants of 2480 16th Street, N.W. v. Dorchester House Assocs.*, CI 20,381 and CI 20,382 (RHC March 26, 1992), at 5 (noting that the Rent Administrator approved a capital improvement petition, but made specific findings of fact about substantial housing code violations in several apartments identified on pre-petition housing inspection reports, and ordered that no rent increases could be implemented until abatement of the violations). Upon correcting all substantial housing code violations identified at the time of the hearing before the Rent Administrator, the housing provider may "self-certify that housing code violations have been abated," *Modern Prop. Mgmt., Inc. v. Dorchester House Tenants Ass'n*, TP 21,425 (RHC March 26, 1992), at 7, and proceed to raise rents in accordance with its approved rent-ceiling increase. Tenants may complain about allegedly unabated housing code violations, or about new housing code violations

### 2. Whether (Presumptive or Actual) Substantial Compliance with the Housing Code Was a Prerequisite to Approval of a Capital Improvement Petition

■ Where we part company with Dorchester is in its further contention that the RHC could not lawfully require the Rent Administrator to make a finding—whether premised on a housing provider's meeting the criteria to invoke the presumption established by D.C.Code § 42–3502.08(b)(2), or on something else—that the housing accommodation was in substantial compliance with the housing code before approving a rent ceiling adjustment. Citing the distinction between actual rent increases and increases in an accommodation's rent ceiling which this court's decisions have recognized,[8] Dorchester acknowledges that substantial compliance with the housing code is required before a rent increase may actually be implemented. Dorchester contends, however, that the Act did not permit the RHC to impose a substantial-compliance requirement as a prerequisite to obtaining approval of a petition to increase the rent *ceiling*. In support of its argument, Dorchester notes that D.C.Code § 42–3502.08 (2001), was entitled "Increases above base rent," a heading that Dorchester contends shows that its provisions relating to substantial compliance with the housing code applied only to actual increases in the rent charged.[9] Dorchester also notes that D.C.Code § 45–3502.10(b), did not list either actual compliance with the housing code or a timely pre-petition inspection (which would give rise to a presumption of compliance with the housing code) among the facts which were to be "establish[ed] to the satisfaction of the Rent Administrator" before a capital improvement petition could be approved.

Dorchester's argument is unavailing in light of 14 DCMR § 4216.1, the RHC regulation that provides that *"[e]ach petition for a rent ceiling adjustment . . . shall be considered a petition to increase rent,* and the Rent Administrator may consider whether the rental unit and common elements of the housing accommodation are in substantial compliance with the housing code." 14 DCMR § 4216.1 (emphasis added). Dorchester contends that the RHC exceeded its authority in adopting Part 4216 because the regulation "appears to require the issue of code violations to be addressed at the hearing held on the capital improvement petition for a rent ceiling increase, even though the Act contains no such linkage." Dorchester asserts that the RHC was "not at liberty to create" such a linkage. However, the RHC "has the express power to promulgate rules and procedures that will effectuate the administration of the rental housing laws." *Saw-*

---

that they believe are an impediment to an actual rent increase, through a tenant petition. *See id.* at 3; *see also Tenants of 4229 East Capitol St. S.E. v. Fort Chaplin Park Assocs.,* CI 20,629 (RHC Jan. 11, 1993), at 10 n. 7; 14 DCMR § 4214.3(e)(1991) ("The tenant of a rental unit or an association of tenants of a housing accommodation may, by petition filed with the Rent Administrator, challenge or contest any rent or rent increase for the rental unit which is . . . (e) Implemented when the rental unit or the common elements of the housing accommodations are not in substantial compliance with the housing regulations . . .").

8. *See, e.g., Sawyer,* 877 A.2d at 106 ("There is a fundamental difference, manifest throughout the rent control regulations, between increasing the rent ceiling and increasing the rent").

9. As Dorchester emphasizes, a housing provider "need not fully exploit each new rent ceiling increase immediately." *Parreco v. District of Columbia Rental Hous. Comm'n,* 885 A.2d 327, 332 (D.C.2005).

*yer,* 877 A.2d at 106, citing D.C.Code § 42–3502.02(a)(1) ("The Rental Housing Commission shall (1) Issue, amend, and rescind rules and procedures for the administration of this chapter"). Although the statute did not unambiguously require that a housing accommodation be in substantial compliance with the housing code before a petition to raise the rent *ceiling* could be approved, the RHC undoubtedly had the power to impose such a requirement if, in its view, that requirement was necessary for proper and efficient administration of the Act and helped to effectuate its purposes.

We do not have the advantage of a statement of purpose from the RHC at the time it promulgated 14 DCMR § 4216.1 in 1986,[10] but decisions of the RHC explain the agency's (fairly contemporaneous) views that "a housing provider who petitions for a ceiling increase is, in effect, seeking authorization to raise rents, now or later, to the new ceiling," and that there was "potential economy in adjudicating the existence of substantial [housing code] violations at the same time that the right to a ceiling adjustment is decided." *Tenants of 1709 Capitol Ave., N.E.,* HP 20,328 (RHC Dec. 15, 1987), at 4 (instructing the Rent Administrator to require housing providers requesting "hardship" rent ceiling increases pursuant to D.C.Code § 42–3502.12, to file current housing inspection reports with their petitions for increases and to consider whether landlords were in compliance with the housing code).

We are satisfied that the RHC's issuance of 14 DCMR § 4216.1—adoption of a regulation specifying that a petition for a rent ceiling increase would be treated like a proposal to actually increase the rent (a course of action that necessitates a showing of substantial compliance with the pre-existing obligation to ensure that housing accommodations meet the requirements of the housing code)—was "a rational exercise of [its] authority as an overseer" of the Act.[11] *District of Columbia Hosp. Ass'n v. Barry,* 586 A.2d 686, 694 (D.C. 1991) (citing *Gemsco, Inc. v. Walling,* 324 U.S. 244, 255, 65 S.Ct. 605, 89 L.Ed. 921 (1945) (stating that when an administrator is given authority to issue regulations "necessary to carry out" the purposes of the statute, "nothing short of express limitation or abuse of discretion in finding that the necessity exists should undermine the action taken to execute it")). Notwithstanding its title "Increases above base rent,"[12] D.C.Code § 42–3502.08(b)(2), stat-

---

10. *See* 33 D.C.Reg. 1336, 1415 (March 7, 1986).

11. This is so even though the RHC may have adopted 14 DCMR Part 4216 with the mistaken view that the Act requires "that [a housing code] inspection be conducted within 30 days prior to filing a rent ceiling petition...." *Tenants of 1709 Capitol Ave., N.E.,* HP 20,328 (RHC Dec. 15, 1987), at 4. *But cf. Arizona v. Thompson,* 281 F.3d 248, 259 (D.C.Cir.2002) ("an agency regulation must be declared invalid, even though the agency might be able to adopt the regulation in the exercise of its discretion, if it was not based on the [agency's] own judgment but rather on the unjustified assumption that it was [the legislature's] judgment that such [a regulation is] desirable

or required") (internal quotation marks and citations omitted).

12. Dorchester contends that this title limited the scope of section 42–3502.08 to actual rent increases and the conditions under which they might be implemented. We are not persuaded, mindful of the Supreme Court's admonition in *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.,* 331 U.S. 519, 67 S.Ct. 1387, 91 L.Ed. 1646 (1947):

[H]eadings and titles are not meant to take the place of the detailed provisions of the [statutory] text. Nor are they necessarily designed to be a reference guide or a synopsis. Where the text is complicated and prolific, headings and titles can do no more than indicate the provisions in a most gen-

**706**

ed in its 2001 version that a housing accommodation shall be considered to be in substantial compliance with the housing code if "[f]or purposes of the filing of petitions for adjustments in the rent ceiling[13] as prescribed in 42–3502.16," each of the rental units .shall have been inspected within the 30–day period immediately preceding the filing of a petition. D.C.Code § 42–3502.08(b)(2) (italics added). In light of this link that the statute drew between petitions for rent ceiling increases and housing code compliance, "[w]e are far from persuaded that the RHC has exercised [its] power unreasonably, or that the regulation in question [14 DCMR § 4216.1] is *ultra vires*." *Sawyer,* 877 A.2d at 106; *see also District of Columbia v. Willard Assocs.,* 655 A.2d 1237, 1241 (D.C.1995) (describing our practice of "accept[ing] the Mayor's understanding of his authority under a statute if it is a 'reasonable construction' of the authority delegated to him by the statute"). Moreover, the RHC's rule, which deems a petition for a rent ceiling adjustment to be a petition to increase rent, harmonized D.C.Code § 42–3502.08(b) (2001) (which describes two ways in which substantial compliance may be shown in connection with rent *ceiling* adjustments, but does not itself require a showing of substantial compliance), with

§ 42–3502.08(a)(1)(A) (2001) (which announces .a substantial compliance standard that must be met before a rent *increase* may be taken).

Dorchester also argues that linking the approval of a rent ceiling increase to housing code compliance conflicted with the RHC's rulings in *Tenants of 500 23rd St., N.W.,* CI 20,266 (RHC Nov. 9, 1989), *and Tenants of 3228 Hiatt Place, N.W. v. H.P. Partnership,* CI 20,281 (Sept. 26, 1989). In *Tenants of 500 23rd St., N.W.,* the RHC stated that "[p]roof of compliance with the Housing Code is not part of the required proof in a capital improvement petition." *Id.* at 13. In *Tenants of 3228 Hiatt Place, N.W.,* the RHC stated that "the presence of housing code violations does not justify the denial of a capital improvement petition." *Id.* at 6. However, these statements do not necessarily de-link housing code compliance and approval of rent-ceiling-increase petitions; rather, the statements are consistent with a policy that a housing provider that caused a current inspection of its housing accommodation to be conducted could take advantage of the statutory *presumption of housing code compliance,* which permitted approval of a rent-ceiling-increase petition even if identified housing code violations had not been abated. Of course, as provided in

eral manner; to attempt to refer to each specific provision would often be ungainly as well as useless. As a result, matters in the text which deviate from those falling within the general pattern are frequently unreflected in the headings and titles. Factors of this type have led to the wise rule that the title of a statute and the heading of a section cannot limit the plain meaning of the text. . . . For interpretative purposes, they are of use only when they shed light on some ambiguous word or phrase. They are but tools available for the resolution of a doubt. But they cannot undo or limit that which the text makes plain.

*Bhd. of R.R. Trainmen,* 331 U.S. at 528–29, 67 S.Ct. 1387 (internal citations omitted).

**13.** We note this specific language while acknowledging the RHC's expressed view that, in the Act, "a variety of inconsistent usages appears." *Winchester Van Buren Tenants Ass'n v. District of Columbia Rental Hous. Comm'n,* 550 A.2d 51, 54 (D.C.1988) (referring to the RHC's acknowledgment that the Act used the phrase "adjustments in rent" sometimes to refer to adjustments in the rent ceiling, and sometimes to refer to adjustments in the rent actually charged). Recognizing that the Act may have contained similar imprecise or inconsistent usage of the phrase "adjustments in the rent ceiling," we do not rely exclusively on this language for our conclusion that 14 DCMR 4216.1 is not *ultra vires.*

D.C.Code § 42–3502.08(a), the provider may not actually raise rents until the violations are abated. *See also* 14 DCMR § 4205.5(a)(1991).

Consistent with the foregoing, we conclude that before the Rent Administrator could approve Dorchester's petition for an adjustment in the rent ceiling, it was required to find that Dorchester House was presumptively or actually in substantial compliance with the housing code. The Rent Administrator could make this finding on the basis of a pre-petition inspection,[14] or (subject to tenant objections) upon a certification that all violations identified during an earlier inspection were timely abated, or—because neither D.C.Code § 42–3502.08(b) (2001) nor 14 DCMR § 4216.3 declared that the foregoing were the exclusive means by which housing code compliance could be demonstrated—on the basis of other evidence satisfactory to the RHC.[15]

### 3. Whether All Rental Units Must Be Inspected to Invoke the Presumption of Substantial Compliance with the Housing Code

Dorchester argues that, at least in the context of an emergency capital improvement, the RHC could not reasonably interpret D.C.Code § 42–3502.08(b)(2) or 14 DCMR § 4216.3(b) to require inspection of all or substantially all rental units in a large apartment building within the 30–day pre-petition period as a condition of applying the presumption of housing code compliance. Dorchester contends that in such emergency cases, the RHC's interpretation created "a virtually insurmountable barrier to the filing of capital improvement petitions and approval of a capital improvement rent ceiling increase[ ]." [16]

■ The record does not support Dorchester's contention that the RHC's interpretation was impracticable in this case. Dorchester was able to arrange for a housing inspection to occur within the 30–day period before it filed its petition. After work began on replacement of Dorchester House's boiler # 2 in August 2001 (work that entailed demolishing the old boiler and pouring a new concrete base for the new replacement boiler), it took about three months for installation to be completed.[17] Dorchester needed to file its capital improvement petition by the tenth day after installation was complete, *see*

---

14. As already discussed, this finding would be based on the statute's presumption of compliance, permitting approval of the petition to increase the rent ceiling. Before Dorchester may actually raise the rents at Dorchester House, there would have to be actual substantial compliance with the housing code.

15. *See* note 21, *infra* (discussing RHC cases in which the housing providers were allowed to establish presumptive housing code compliance on the basis of post-petition inspections).

16. Dorchester argues that:

> No one contemplated that after the emergency work is done an inspection would be required before the petition would be filed. This is evident from the fact that D.C.Code § 42–3502.10(i) of the Act and the regula-

tions (14 DCMR §§ 4210.3 and 4210.4) require an emergency petition to be filed within ten (10) days *after* the work is done. Under the Commission's reading, the insurmountable 30–day inspection period is cut down to an impossible 10–day window.

Petitioner's Brief at 12–13 (underscoring in the original).

17. The Rent Administrator deemed the time of completion of installation—the event that triggered the ten-day deadline for filing the emergency capital improvement petition, *see* D.C.Code § 42–3502.16(g) and (i)—to be the date when Dorchester "was contracted to pay the balance of the cost after the completion of the engineer's punch list, which was two months after the [October 22, 2001] government inspection." Rent Administrator's Decision at 4, 7.

D.C.Code § 42–3502.10(i), but it was not required to wait until installation was complete to file the petition.[18] Once inspection of the apartment units was conducted early in the three-month period during which the boiler was installed, Dorchester knew to file its petition within thirty days after the units' inspections, so as to satisfy the terms of D.C.Code § 42–3502.08(b)(2). We leave to another day the issue of whether the RHC's reading could create an "impossible window" in different circumstances of some future case. Here, the RHC's interpretation did not create an impossible window,[19] so we discern no reason in this case to reject the RHC's interpretation that inspection of all (or, as suggested below, substantially all) rental units was a prerequisite to invoking the presumption of substantial compliance.[20]

We note, moreover, that prior to its decision in the instant case, the RHC had previously considered whether the reference in D.C.Code § 42–3502.08(b)(2), to "each of the rental units in the housing accommodation" being inspected within the 30–day pre-petition period, must be strictly applied. The RHC held that the inspection "must cover substantially all rental units in the housing accommodation," reasoning that units "to which access is denied by the tenant" may be excluded. *Tenants of 1709 Capitol Ave.*, HP 20,328 (RHC Dec. 15, 1987), at 11. "We are obliged to sustain the RHC's interpreta-

tion ... unless it is unreasonable or embodies 'a material misconception of the law,' even if a different interpretation also may be supportable." *Sawyer*, 877 A.2d at 102–03 (citing *Jerome Mgmt., Inc. v. District of Columbia Rental Hous. Comm'n*, 682 A.2d 178, 182 (D.C.1996)); *see also Remin v. District of Columbia Rental Hous. Comm'n*, 471 A.2d 275, 279 (D.C. 1984) (noting that we will reject the Commission's interpretation only if it is "plainly wrong or incompatible with the statutory purposes"). The RHC's interpretation regarding the inspection of all rental units within a housing accommodation not only is consistent with the plain language of the statute, but also is of long standing, calling for heightened deference. *See Tenants of 738 Longfellow St., N.W.*, 575 A.2d at 1213 ("The deference which courts owe to agency interpretations of statutes which they administer is, of course, at its zenith where the administrative construction has been consistent and of long standing").

That said, we note that the RHC has reserved judgment on whether administrative difficulties and delay could justify a deviation from the "each rental unit" requirement such that, for example, "inspecting the common elements and a representative sample, but less than all, of the units" would be sufficient to raise the statutory presumption. *Tenants of 1709 Capitol Ave.*, HP 20,328 (RHC Dec. 15, 1987), at 11 n. 7. Thus, we have no basis for

---

18. *See Tenants of 500 23rd St., N.W.*, 585 A.2d at 1331 (noting that the RHC rejected a reading that "the petition may only be filed within the 10–day period after installation, not before").

19. We note, moreover, that a letter in the record from DCRA confirms that the agency is "able to perform the inspections of 394 apartments in a single building, and issue to the owner the results of those inspections within a 30–day period."

20. We can also leave to another day resolution of what, if any, additional leeway must be afforded to housing providers to take into account the Rent Administrator's apparent failure to comply with the RHC's directive, in *Tenants of 1709 Capitol Ave.*, that the Rent Administrator "propose within sixty (60) days formal regulations for compliance with § [42–3502.08](b)(2)," spelling out the "detailed operational procedures" for compliance. *Tenants of 1709 Capitol Ave.*, HP 20,328 (RHC Dec. 15, 1987), at 12.

predicting that housing providers will be confronted with the "impossible window" that Dorchester decries.[21]

#### 4. Why Remand Is Appropriate

■ Finally, we consider Dorchester's assertion—which respondent has not contradicted—that the Rent Administrator's practice, prior to the decision in issue here, was to accept housing providers' self-certifications that inspections were requested or conducted as sufficient to trigger the statutory presumption, for rent ceiling adjustment purposes, that a housing accommodation was in substantial compliance with the housing code. Dorchester represents that, in previous cases of which it is aware, the Rent Administrator did not require verification by the Housing Inspection Division that all units were inspected within thirty days before the rent ceiling adjustment petition was filed. Dorchester argues that the RHC should be foreclosed from "adopt[ing] a wholesale change of policy without prior notice."

We note that—consistent with Dorchester's claim—in acting on capital improvement petitions that Dorchester filed in 1998, the Rent Administrator relied on "the housing provider's testimony and certification that the housing inspections occurred" to approve the petitions. *See Tenants of 2480 16th Street, N.W. v. Dorchester House Assocs.,* CI 20,739 and 20,-741 (RHC Jan. 14, 2000), at 14. The RHC upheld the Rent Administrator's approval of the petition (although remanding for a re-calculation of the rent ceiling) as based on substantial evidence, even though no housing inspection reports were submitted during the hearing before the Rent Administrator. *Id.*

Other RHC decisions as well show that the RHC has been inconsistent regarding what showing as to a housing inspection was required to support a rent ceiling adjustment petition. For example, the RHC's decision in *Hiatt Place, L.L.C. v. Tenants of 3228 Hiatt Place, N.W.,* CI 20,780 (RHC March 24, 2006), explains that after initially denying a petition for the "lack of record evidence to establish the completion of a ... conducted housing inspection of the subject property," the Rent Administrator granted the housing provider's motion for reconsideration and granted the petition. *Id.* at 2. The Rent Administrator did so in light of the housing provider's submission of a copy of its letter requesting a pre-petition housing inspection, a letter that the housing provider had failed to include among the evidence

---

**21.** The RHC's decisions in *Hampton House N. Tenants Ass'n v. Shapiro,* CI 20,669 and CI 20,670 (RHC Feb. 9, 1998), and *Tenants of 4201–4224 E. Capitol St., S.E. v. Fort Chaplain Park Assocs.,* CI 20,629 (Feb. 14, 1994), indicate that the RHC has taken a flexible approach with respect to the timing of inspections conducted to facilitate approval of capital improvement petitions. In *Hampton House,* the RHC noted that the Rent Administrator permitted the housing provider to avail itself of the statutory presumption of housing code compliance by scheduling a housing inspection *after* (instead of up to thirty days *before*) filing its rent-ceiling-increase petition. While stating that it did "not condone this type of conduct" by the Rent Administrator,

the RHC found that it was "harmless error." *Id.* at 29.

In *Hampton House,* the RHC also acknowledged that in its earlier decision in *Tenants of 4201–4224 East Capitol Street,*

[T]he Commission initially denied the capital improvement, because the capital improvement petition was filed seven (7) months after the inspection. However, the Commission remanded the case and allowed the housing provider to schedule an inspection and certify that the inspection was done. The Commission approved the capital improvement petition after the inspection was done.

*Hampton House,* CI 20,669 and CI 20,670 (RHC Feb. 9, 1998), at 30.

presented at the hearing on its petition. *Id.* at 2–3. Notwithstanding the apparent lack of evidence that a full pre-petition inspection actually was conducted, the RHC did not disturb the Rent Administrator's decision on this point.

We are unable to reconcile the various approaches that the Rent Administrator and the RHC have taken with respect to what documentation was required in connection with a rent ceiling adjustment petition. But, given the foregoing examples and others mentioned in note 21, *supra,* and note 22, *infra,* we are persuaded by Dorchester's notice argument. Because it appears that Dorchester was not on notice that more than its self-certification of a pre-petition inspection would be required, or that it might need to demonstrate Dorchester House's substantial compliance with the housing code in some other way, we conclude that this matter must be remanded so that Dorchester may have an opportunity to present evidence as to Dorchester House's (presumptive or actual) substantial compliance with the housing code. This remedy is consistent with the approach that the RHC has taken in other cases to avoid prejudice to housing providers from inconsistent enforcement of the rules and policies governing rent ceiling adjustment petitions.[22]

*Reversed and remanded for further proceedings not inconsistent with this opinion.*

22. *See, e.g., The Ambassador Apts., et al v. Columbia Plaza Ltd P'ship,* CIs 20,418–20,426 (Jan. 5, 1993), in which the RHC found that the Rent Administrator had "wrongfully waived" pre-petition inspection. *Id.* at 10. The RHC dismissed the petition without prejudice, stating that "if the housing provider chooses to reinstate this capital improvement petition, the only additional evidentiary requirement which the housing provider must meet is inclusion of a current housing inspection report or proof that one was performed pursuant to this Order." *Id.; cf. Tenants of 500 23rd St., N.W.,* CI 20,266 (RHC Nov. 9, 1989), at 14 (reasoning that the Rent Adminis-

trator's erring "by not properly enforcing the inspection requirement" supported a need for prospectivity in "chang[ing] from the long-standing policy of less than full enforcement ..."); *Tenants of 1709 Capitol Ave.,* HP 20,-328 (RHC Dec. 15, 1987), at 7–8 (calling for prospective application of the RHC's interpretation because the Rent Administrator's practice of not requiring providers to show proof that inspections had actually been completed "was reflected in the approved petition forms and had been accepted and followed by the regulated housing industry for several years").